AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of New York   ☒

| | |
|---|---|
| G & G Closed Circuit Events LLC <br><br>_____ <br>*Plaintiff(s)* <br>v. <br>Ashleigh Bertolini, individually and d/b/a PARQ; and GLO 718 Corp., an unknown business entity d/b/a PARQ <br>_____ <br>*Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) ) )  Civil Action No. |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Ashleigh Bertolini
3589 State Route 52
Pine Bush NY 12566

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: M.L. Zager, P.C.
461 Broadway
PO Box 948
Monticello NY 12701
(845) 794-3660

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT

Date:  9/2/2021    /S/ V. BRAHIMI
_____     _____
Signature of Clerk or Deputy Clerk

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*

My fees are $ _____ for travel and $ _____ for services, for a total of $ ____0.00____

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

Joseph P. Loughlin
Law Offices of M.L. Zager, P.C.
461 Broadway, PO Box 948
Monticello NY 12701
jloughlin@mzager.com
Fax: 845-794-3919
Tel: 845-794-3660

Attorneys for Plaintiff
G & G Closed Circuit Events LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

G & G Closed Circuit Events LLC

     Plaintiff,

vs.

Ashleigh Bertolini, individually and d/b/a
PARQ; and GLO 718 Corp., an
unknown business entity d/b/a PARQ

     Defendants.

Case No.: 21-cv-7351

**COMPLAINT**

**PLAINTIFF ALLEGES:**

## JURISDICTION

1. Jurisdiction is founded on the existence of a question arising under particular statutes. This action is brought pursuant to several federal statutes, including the Communications Act of 1934, as amended, Title 47 U.S.C. 605, *et seq.*, and The Cable & Television Consumer Protection and Competition Act of 1992, as amended, Title 47 U.S. Section 553, *et seq.*

2. This Court has jurisdiction of the subject matter of this action pursuant to 28 U.S.C. Section 1331, which states that the District Courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties, of the United States.

3. This Court has personal jurisdiction over the parties in this action as a result of the Defendants' wrongful acts hereinafter complained of which violated the Plaintiff's rights as the exclusive commercial domestic distributor of the televised fight *Program* hereinafter set forth at length. The Defendants' wrongful acts consisted of the interception, reception, publication, divulgence, display, and exhibition of said property of Plaintiff within the control of the Plaintiff in the State of New York.

## VENUE AND INTRADISTRICT ASSIGNMENT

4. Venue in this Court is proper under 28 U.S.C. §1391 as a substantial part of the Programs or omissions giving rise to the claims herein occurred in this District.

5. Assignment to the Southern District of New York is proper because a substantial part of the Programs or omissions giving rise to the claim occurred in Bronx County and/or the United States District Court for the Southern District of New York has decided that suits of this nature, and each of them, are to be heard by the Courts in this particular Division.

## THE PARTIES

6. Plaintiff, G & G Closed Circuit Events LLC is, and at all relevant times hereto was, a California corporation with its principal place of business located at 2925 Green Valley Parkway, Suite D, Henderson, NV 89014.

7. GLO 718 Corp., an unknown business entity d/b/a PARQ (hereinafter "GLO 718 Corp."), at all times relevant hereto, was a Domestic Business Corporation organized and existing under the laws of the State of New York.

8. At all times relevant hereto, GLO 718 Corp. was an owner, and/or operator, and/or licensee, and/or permittee, and/or person in charge, and/or an entity with dominion, control, oversight and management of the commercial establishment doing business as PARQ operating at

4001 E Tremont Avenue Bronx NY 10465.

9. At all times relevant hereto, Defendant Ashleigh Bertolini was identified as Owner and Principal of GLO 718 Corp., which owned and operated the commercial establishment doing business as PARQ operating at 4001 E Tremont Avenue Bronx NY 10465.

10. At all times relevant hereto, Defendant Ashleigh Bertolini was identified by the New York State Liquor Authority as the Principal for GLO 718 Corp. on the New York State Liquor Authority License for GLO 718 Corp. (License Serial No. 1309967), for the commercial establishment GLO 718 Corp. operating at 4001 E Tremont Avenue Bronx NY 10465.

11. At all times relevant hereto, Defendant Ashleigh Bertolini was the sole individual identified on the On Premises Liquor License (License Serial No. 1309967) issued to GLO 718 Corp. for the commercial establishment PARQ operating at 4001 E Tremont Avenue Bronx NY 10465.

12. Plaintiff is informed and believes, and alleges thereon that on Saturday, May 4, 2019 (the night of the *Program* at issue herein, as more specifically defined in Paragraph 19) Defendant, Ashleigh Bertolini, as the Owner and Principal of GLO 718 Corp., and as the sole individual identified on the On Premises Liquor License (License Serial No. 1309967) for GLO 718 Corp. had the right and ability to supervise the activities of PARQ, which included the unlawful interception, receipt and publication of Plaintiff's *Program*.

13. Plaintiff is informed and believes, and alleges thereon that on Saturday, May 4, 2019 (the night of the *Program* at issue herein, as more specifically defined in Paragraph 19) Ashleigh Bertolini as the Owner and Principal of GLO 718 Corp. and as the sole individual identified on the On Premises Liquor License (License Serial No. 1309967) for GLO 718 Corp. had the obligation to supervise the activities of PARQ operating at 4001 E Tremont Avenue Bronx NY 10465, which included the unlawful interception, receipt and publication of Plaintiff's *Program*.

14. Plaintiff is informed and believes, and alleges thereon that on Saturday, May 4, 2019 (the night of the *Program* at issue herein, as more specifically defined in Paragraph 19), Defendant Ashleigh Bertolini specifically directed the employees of PARQ to unlawfully intercept, receive and broadcast Plaintiff's *Program* at PARQ or intentionally intercepted, and/or published the *Program* at PARQ himself. The actions of the employees of PARQ are imputable to Defendant Ashleigh Bertolini by virtue of his acknowledged responsibility for the operation of PARQ.

15. Plaintiff is informed and believes, and alleges thereon that on Saturday, May 4, 2019 (the night of the *Program* at issue herein, as more specifically defined in Paragraph 19), Defendant Ashleigh Bertolini as the Owner and Principal of GLO 718 Corp. and as the sole individual identified on the On Premises Liquor License (License Serial No. 1309967) for GLO 718 Corp. , had an obvious and direct financial interest in the activities of PARQ operating at 4001 E Tremont Avenue Bronx NY 10465, which included the unlawful interception, receipt and publication of Plaintiff's *Program.*

16. Plaintiff is informed and believes, and alleges thereon that the unlawful interception, receipt and publication of Plaintiff's *Program,* as supervised and/or authorized by Defendant Ashleigh Bertolini, resulted in increased profits or financial benefit to PARQ.

17. Plaintiff is informed and believes, and alleges thereon that on Saturday, May 4, 2019 (the night of the *Program* at issue herein, as more specifically defined in Paragraph 19), Defendant, Ashleigh Bertolini as the Owner and Principal of GLO 718 Corp. was a moving and active conscious force behind the operation, advertising and promotion of PARQ operating at 4001 E Tremont Avenue Bronx NY 10465, and is responsible for all activities that occurred therein, which included the unlawful interception and exhibition of Plaintiff's *Program.*

**Factual Background**

18. Plaintiff G & G Closed Circuit Events LLC hereby incorporates by reference all of the allegations contained in paragraphs 1-17, inclusive, as though set forth herein at length.

19. Plaintiff entered into a license agreement with Perform Investment Limited through which Plaintiff was granted the exclusive nationwide commercial distribution (closed-circuit) rights to Saul Alvarez v Daniel Jacobs, WBA/WBC/IBF World Middleweight Championship Fight *Program*, telecast nationwide on Saturday, May 4, 2019 , including undercard or preliminary bouts (the match and all related bouts are collectively referred to as the "*Program*"), at commercial establishments such as theaters, arenas, bars, clubs, lounges, restaurants and the like throughout New York and other geographic locales (the "License Agreement"). A copy of the License Agreement is annexed hereto as **Exhibit A**. Plaintiff paid substantial fees for its exclusive rights to exhibit the Program under the License Agreement.

20. Pursuant to the terms of the License Agreement, Plaintiff G & G Closed Circuit Events LLC, entered into subsequent sublicensing agreements with various commercial entities throughout North America, including entities within the State of New York, by which it granted these entities limited sublicensing rights, specifically the rights to publicly exhibit the Program within their respective commercial establishments.

21. The Program could only be exhibited in a commercial establishment in New York if said establishment was contractually authorized to do so by Plaintiff G & G Closed Circuit Events LLC.

22. Pursuant to the License Agreement, G & G Closed Circuit Events LLC marketed and distributed the closed-circuit rights granted to it. G & G Closed Circuit Events LLC contracted with various establishments throughout New York and granted to such establishments the right to broadcast the Program in exchange for a fee.

23. As a commercial distributor and licensor of sporting Programs, including the *Program*, Plaintiff G & G Closed Circuit Events LLC    , expended substantial monies marketing, advertising, promoting, administering, and transmitting the *Program* to its commercial customers.

24. The transmission of the *Program* was electronically coded or "scrambled". In order for the signal to be received and telecast clearly, it had to be decoded with electronic decoding equipment. The *Program* originated via satellite uplink and was subsequently re-transmitted to cable systems and satellite companies via satellite signal.

25. If a commercial establishment was authorized by Plaintiff to receive the *Program*, the establishment was provided with the electronic decoding equipment and the satellite coordinates necessary to receive the signal, or the establishment's satellite or cable provider would be notified to unscramble the reception of the *Program* for the establishment, depending upon the establishment's equipment and provider.

26. On Saturday, May 4, 2019 (the night of the Program at issue herein, as more specifically defined in paragraph 19), PARQ broadcast the Program on eleven (11) screens with approximately 60-63 people in attendance.

27. On information and belief, on Saturday, May 4, 2019 (the night of the Program at issue herein, as more specifically defined in paragraph 19), PARQ sold alcoholic and non-alcoholic beverages to its patrons

28. The commercial fee for an establishment the size of PARQ to broadcast the Program lawfully was $$875.00 . Neither Defendant Ashleigh Bertolini nor GLO 718 Corp. paid such a fee to Plaintiff.

## COUNT I

### (Violation of Title 47 U.S.C. Section 605)

29. Plaintiff G & G Closed Circuit Events LLC, hereby incorporates by reference all of the allegations contained in paragraphs 1-28, inclusive, as though set forth herein at length.

30. On Saturday, May 4, 2019 in violation of G & G Closed Circuit Events LLC's rights and federal law, Defendants intercepted and/or received the satellite communication of the Program at PARQ. Defendant also divulged and published said communication, or assisted in divulging and publishing said communication to patrons within PARQ.

31. The *Program* was broadcast at PARQ without the authorization or approval of Plaintiff.

32. With full knowledge that the *Program* was not to be intercepted, received, published, and/or exhibited by commercial entities unauthorized to do so, the above named Defendants, either through direct action or through actions of employees or agents directly imputable to Defendants (as outlined in paragraphs 7-17 above), did unlawfully intercept, receive, publish, and/or exhibit the *Program* at the time of its transmission at her commercial establishment PARQ, operating at 4001 E Tremont Avenue Bronx NY 10465.

33. Said unauthorized interception, reception, publication, and/or exhibition by the Defendants was done willfully and for purposes of direct and/or indirect commercial advantage and/or private financial gain, as confirmed by, *inter alia*, the broadcasting of the *Program* on eleven (11) televisions screens, and the sale of alcoholic beverages during the broadcast.

34. Title 47 U.S.C. § 605(a), and in particular the second through fourth sentences thereof, prohibits the unauthorized interception, receipt, publication and use of radio communications (which include satellite signals) such as the transmission of the Program for which Plaintiff G & G Closed Circuit Events LLC, had the distribution rights thereto.

35. By reason of the aforesaid mentioned conduct, the aforementioned Defendants, violated Title 47 U.S.C. § 605(a).

36. By reason of the Defendants' violation of Title 47 U.S.C. § 605(a), Plaintiff G & G Closed Circuit Events LLC, has the private right of action pursuant to Title 47 U.S.C. § 605.

37. As the result of the aforementioned Defendants' violation of Title 47 U.S.C. § 605(a), and pursuant to said Section 605, Plaintiff G & G Closed Circuit Events LLC, is entitled to the following from Defendants:

(a) Statutory damages for each violation of in an amount to $10,000 pursuant to Title 47 U.S.C. Section 605(e)(3)(C)(i)(II);

(b) Statutory damages for each willful violation in an amount to $100,000.00 pursuant to Title 47 U.S.C. § 605(e)(3)(C)(ii); and

(c) The recovery of full costs, including reasonable attorneys' fees, pursuant to Title 47 U.S.C. Section 605(e)(3)(B)(iii).

**WHEREFORE, Plaintiff prays for judgment as set forth below.**

## COUNT II

### (Violation of Title 47 U.S.C. Section 553)

38. Plaintiff G & G Closed Circuit Events LLC hereby incorporates by reference all of the allegations contained in paragraphs 1-37, inclusive, as though set forth herein at length.

39. Title 47 U.S.C. § 553(a) prohibits the unauthorized interception or receipt of programming such as Plaintiff's over a cable system.

40. Upon information and belief, and as an alternative to Count I, on Saturday, May 4, 2019 in violation of G & G Closed Circuit Events LLC's rights and federal law, Defendants willfully intercepted and/or received the original communication of the *Program* at PARQ via a cable system.

41. Said unauthorized interception and reception by the Defendants was done willfully and for purposes of direct and/or indirect commercial advantage and/or private financial gain, as confirmed by, inter alia, the broadcasting of the *Program* on eleven (11) screens, and the sale of alcoholic and non- alcoholic beverages during the broadcast.

42. The unauthorized interception or reception of the Program by the Defendants was prohibited by Title 47 U.S.C. § 553(a).

43. By reason of the aforesaid mentioned conduct, the Defendants violated Title 47 U.S.C. § 553(a).

44. By reason of the Defendants' violation of Title 47 U.S.C. § 553(a), Plaintiff G & G Closed Circuit Events LLC, has the private right of action pursuant to Title 47 U.S.C. § 553.

45. As the result of Defendants' violation of Title 47 U.S.C. § 553(a), Plaintiff G & G Closed Circuit Events LLC, is entitled to the following from Defendants:

(a) Statutory damages for each violation in an amount to $10,000.00 pursuant to Title 47 U.S.C. § 553(c)(3)(A)(ii);

(b) Statutory damages for each willful violation in an amount to $50,000.00 pursuant to Title 47 U.S.C. § 553(c)(3)(B);

(c) The recovery of full costs pursuant to Title 47 U.S.C. Section 553 (c)(2)(C); and

(d) In the discretion of this Honorable Court, reasonable attorneys' fees, pursuant to Title 47 U.S.C. Section 553 (c)(2)(C).

**WHEREFORE, Plaintiff prays for judgment as set forth below.**

**As to the First Count:**

1. For statutory damages in the amount of $110,000.00 against the Defendants;

2. For reasonable attorneys' fees as mandated by statute;

3. For all costs of suit, including, but not limited to, filing fees, service of process fees, investigative costs; and

4. For such other and further relief as this Honorable Court may deem just and proper.

### As to the Second Count:

1. For statutory damages in the amount of $60,000.00 against the Defendants;

2. For reasonable attorneys' fees as may be awarded in the Court's discretion pursuant to statute;

3. For all costs of suit, including, but not limited to, filing fees, service of process fees, investigative costs; and

4. For such other and further relief as this Honorable Court may deem just and proper.

Date:  August  9  , 2021

Respectfully submitted,

LAW OFFICES OF M.L. ZAGER, P.C.
By: Joseph P. Loughlin
Attorneys for Plaintiff
G & G Closed Circuit Events LLC

# EXHIBIT A

# PERFORM INVESTMENT LIMITED

## MASTER SERVICES AGREEMENT

This Master Services Agreement (the "Agreement" or "MSA") is entered into as of the 1st day of May 2019 ("**Effective Date**") by and between Perform Investment Limited a company incorporated and existing under the laws of England and Wales with company number 09676399, whose registered office is at Hanover House, Plane Tree Crescent, Feltham TW13 7BZ, England ("**DAZN**" or "**Promoter**") and G&G Closed Circuit Events, LLC a company incorporated and existing under the laws of Nevada whose registered office is at 2925 Green Valley Parkway, Suite D, Henderson, Nevada 89014 ("**G&G**" or "**Licensee**"), under which Licensee will distribute certain media rights as described below on the terms and conditions herein.

In consideration of the mutual covenants herein contained, the sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.    **Grant of Right.** DAZN hereby grants Licensee the exclusive right to sublicense certain DAZN events ("individually described as an "Event", or collectively described as the "Events", as the case may be") specified in Exhibit A and B [Statement of Work 1 and 2 "SOW 1, 2"] as well as Events described within any future applicable SOWs, if any, to Commercial Premises (as described below) within the United States of America and Puerto Rico ("**Territory**"). For the purposes of this Agreement, "**Commercial Premises**" means non-residential locations, including, but not limited to, bars, clubs, pubs, lounges, social clubs, event halls, and restaurants of a commercial or non-commercial nature, each with a fire code occupancy capacity not to exceed                    (except for outlets within certain casinos where the seating capacity may exceed                    located within the Territory, except establishments identified on any "**Black Spot List**", as provided by DAZN for each SOW. For the avoidance of doubt, Commercial Premises shall exclude hotel guest rooms, theaters, arenas, racetracks, in-flight aircraft or other transportation facilities.

2.    **Reserved Rights.** Any and all rights not expressly granted to Licensee under this Agreement are reserved by DAZN which shall include, but not be limited to, any form of betting, data, private and public viewings (other than viewing by individuals in Commercial Premises in the Territory which are primarily indoors; this would include a bar with an outdoor terrace, but exclude a public screening in a park, stadium, street, or fan zone, for example), transportation and archive rights, and as additionally provided by DAZN for each SOW. Licensee acknowledges and agrees that DAZN may at its discretion either exercise any such rights itself or authorize any third party to exercise any such rights, whether in the Territory or otherwise. Licensee acknowledges and agrees that this shall include the right for DAZN or third parties authorized by DAZN to produce and transmit Events for viewing for promotional, marketing, sponsorship, partnership, scouting, training, analysis and/or similar purposes.

3.    **License Fee.** As full and complete compensation for the rights granted to Licensee by Promoter, Licensee shall pay to Promoter the license fee calculated as follows:

1

    a.    Licensee shall pay the Minimum Guarantee on a per Event basis per the terms in applicable SOW and pursuant to the provisions of Paragraph 4 of this Agreement;

    b.    Then, the amount of all gross revenues in excess of the Minimum Guarantee (as defined below) (which threshold amount Licensee shall retain in recoupment of the Minimum Guarantee) which Licensee receives from all closed circuit television exhibitions of the Events in the Territory shall be payable as follows:

    c.    In the event that Licensee should sublicense a Commercial Premise for a fixed lump sum or for a license fee which includes a guaranteed amount which is not exceeded by Licensee's share of revenues from that Commercial Premise, Licensee shall include in gross revenue hereunder the amount equal to such lump sum or guarantee.

    d.    Licensee covenants to Promoter that Licensee will use best efforts to support and service Licensee's sublicensees or Outlets (as defined in Exhibit B) in advance of, during, and subsequent to the broadcasts of the Events referenced on the Statement of Work 1 (Exhibit A) of this Agreement and any future applicable SOWs by providing sufficient staff, telephone, or other resources necessary to address any inquiries or issues that may arise concerning sublicensing of the Events, receipt of signal to the Events, payment of sublicense fees regarding the Events, receipt and use of marketing materials related to the Events and related issues or matters that may arise requiring the input, attention, and involvement of the Licensee to respond and assist the sublicensees and Outlets exhibiting the Events or seeking to do so.

    e.    Credit Card expenses incurred by the Licensee for payment processing of license fees from establishments and approved in advance by DAZN shall be applied against the license fee revenues and "taken off the top" prior to any revenue share between the parties and will be capped at          of gross revenues. Licensee may deduct up to          of gross for advertising materials, including publicity, marketing collateral printing and shipping expenses on an event by event basis. All such advertising materials shall be subject to Promoter's prior written approval. Licensee will only deduct actual and verifiable costs and deliver line item reports for such costs and DAZN will have the right to audit such expenses on a per Event basis. Such expenses will not include any commissions or distribution fees to third party sales agents or distributors.

    f.    DAZN shall set and approve all pricing and rate cards for each Event in an applicable SOW. Licensee may negotiate volume discounts and charge above the rate card within          but shall not discount below the rate card without DAZN's prior written approval via email.

g.    DAZN shall have the right to engage in discussions and direct negotiations with establishments identified on "Black Spot" list for each applicable SOW, where revenues obtained through such establishments shall be accounted for in the Minimum Guarantee from the Licensee to DAZN.

4.    **Minimum Guarantee.**

a.    Licensee shall pay Promoter a minimum guarantee and non-refundable advance against the License Fee pursuant to Paragraph 3 of this Agreement as described in each applicable SOW (**"Minimum Guarantee"**) not later than one (1) business day prior to each applicable Event; and

b.    The Minimum Guarantee amount shall be paid by:

i.    a certified check or bank cashier's check payable to "Perform Investment Limited" in such amount; or

c.    Payment of all license fee amounts in excess of the applicable Minimum Guarantee for under each SOW shall be due and payable to Promoter not later than thirty (30) business days after the Event.

5.    **Equipment & Signal Transmission of the Telecast of Events.** Licensee and Licensee's sublicensees shall be responsible to obtain, at Licensee's or their cost and expenses, either:

a.    Authorization to receive the telecast of the Events through the services of one or more satellite ("DDS") programming providers such as DirecTv or DISH Network, to be selected by Licensee and approved by Promoter in writing in advance; or

b.    Authorization to receive the telecast of the Events through the services of one or more cable programming providers to be selected by Licensee and approved by Promoter in writing in advance; or

c.    Authorization to receive the telecast of the Events through the services of one or more alternate programming providers (such as streaming sites), to be selected by Licensee and approved by Promoter.

        d.      Licensee shall not charge activation or signal transmission fees to Licensee's sublicensees in excess of such fees charged to Licensee by any programming providers delivering signal transmission of the Telecast of the Events. Any equipment charges necessary to Licensee's sublicensees to receive the Events shall be at Licensee's cost and/or the cost of Licensee's sublicensees.

6.     **Delivery of Signal**

        a.      Promoter shall deliver either, as Promoter shall elect in its discretion, (i) the encrypted transmission of the video and audio signal of its telecast of the Events to a domestic satellite or other delivery point from which the signal is capable of being received by Strategic, DSS and/or VUBIQUITY, for redistribution to Licensee's designated outlets or (ii) by fiber optic cable to a delivery point at which the signal is capable of being received by DSS and VUBIQUITY, for redistribution to Licensee's designated outlets. Such delivery to the delivery point shall constitute full and complete discharge of the obligations of Promoter to Licensee hereunder. Strategic, DSS and/or VUBIQUITY, if applicable, as the case may be, shall have the responsibility to address and authorize decoders or any other such equipment for Licensee's authorized sublicensees. Licensee shall be responsible for all charges for addressing and authorizing Licensee's sublicensees, as well as all costs and expenses necessary for the reception of the signal and for the projection at the outlets.

        b.      Promoter shall have no responsibility for Licensee's signal transmission, equipment, decoder and/or authorization fees, and Promoter shall have no responsibility or liability to Licensee or Licensee's sublicensees for any technical failures which may occur in connection with the authorizing of equipment or decoders for Licensee's sublicensed closed circuit exhibition outlets or in connection with any retransmission or authorizing by Strategic, DSS and/or VUBIQUITY, and in such case, Licensee remain responsible for payment of the License Fee to Promoter.

        c.      Licensee shall instruct Strategic, DSS and/or VUBIQUITY, if applicable, to provide directly to Promoter, on the first business day after the Events, their complete final sublicense reports which shall indicate the name, address, and city of each sublicensed outlet and the decoder number for each sublicensed outlet.

7.     **Online Internet Transmissions**

        Licensee acknowledges the Promoter will (or may) be licensing the live and delayed cable television, direct broadcast satellite television and digital online internet transmission and exhibitions of the Events in the Territory to residential locations for DAZN customers; except for Anti-Piracy Enforcement as specified below, Licensee shall have no interest or participation in such exhibitions or any other exploitation of the Events. Accordingly, Licensee has no right to record, duplicate or copy the Events by any means or to exhibit, reproduce or retransmit the Events or any portion thereof.

4

8.    <u>Anti-Piracy Enforcement</u>

Licensee and Licensee's sublicensees shall use their best efforts to employ adequate security systems and other measures to prevent theft, pirating, copying, duplication or unauthorized exhibition or transmission of the Events. Licensee shall promptly advise the Promoter of any piracy (i.e., unauthorized use or proposed use) of the Events in the Territory.

a) Notwithstanding the fact that Licensee has secured the rights from Promoter to sublicense live DAZN telecasts of the Events at Commercial Premises within the Territory under this Agreement and applicable SOWs, Licensee shall have the right to identify and thereafter prosecute any and all acts of alleged piracy of the Events, regardless of the means of transmission (i.e., international broadcasts, internet streaming, replay on private media, etc.) and regardless of whether the Events are exhibited in real-time or on a delayed-broadcast basis against the operators, permittees, officers, members, and other persons (both individuals and entities) with interests, involvement, and/or affiliation with the Commercial Premises within the Territory identified exhibiting the Events in an unauthorized manner. Licensee's right to prosecute piracy regarding unauthorized exhibition of the Events shall be limited exclusively to claims against operators, permittees, officers, members, and other persons (both individuals and entities) with interests, involvement, and/or affiliation with the Commercial Premises within the Territory only, and shall be subject to Reserved Rights and any other exclusions subsequently agreed upon by Promoter and Licensee and thereafter memorialized in an applicable SOW.

b) Licensee shall provide Promoter advanced, written notice of potential suit filings prior to commencing litigation in the Territory. Subject to Promoter's written consent which shall not be unreasonably withheld, Licensee shall be afforded all necessary remedies at law or equity to protect Promoter and Licensee in the prosecution of piracy and infringement claims involving the Events, including instituting suit under the federal telecommunication statutes (i.e., Titles 47 U.S.C. §553 and §605), state statutes, common law causes of action that may be applicable, claims and copyright (i.e., Title 17 U.S.C. §101). Notwithstanding Licensee's exclusive right to prosecute piracy claims involving the Commercial Premises within the Territory, all such litigation will be conducted on terms mutually agreeable between the Promoter and Licensee.

c) Licensee is the sole and exclusive agent and representative with respect to grant, lease, sale, use or other exploitation of reproduction rights to Events for purposes of performance and transmission of the of the Events in Commercial Premises in the Territory, as described within this Agreement and any applicable SOW. Licensee shall be the exclusive owner of the copyright for the Events for the purposes of performance and transmission of the Events in Commercial Premises in the Territory from the Effective Date. Licensee has all right, title and interest in any accrued or later accrued claims, causes of action, or lawsuits brought to enforce copyrights in the Events, appointing and permitting Licensee to prosecute said accrued or later accrued claims as if it were DAZN. DAZN shall not grant the exclusive ownership of the copyright for the Events for the purposes of performance and transmission of the Events in Commercial Premises from the Effective Date herein granted to Licensee to any other party.

d) Upon expiration or termination of this Agreement, all rights licensed or otherwise transferred to Licensee hereunder, including copyright, shall cease and revert to DAZN, and Licensee agrees to execute all instruments necessary and desirable to revert said rights in DAZN.

e) In case Licensee should enforce copyright or piracy rights based on infringement of Licensee's rights granted under this Agreement, then Licensee shall always take legal actions only in Licensee's name and not DAZN's name.

f) Any damages, whether statutory, compensatory, punitive or otherwise, which Licensee may recover from the theft, piracy, copying, duplication, unauthorized exhibition or transmission of the Events in the Territory, and after payment of costs, expenses, and attorneys' fees, shall constitute gross revenues from the Events, to be shared by, and distributed to, the Promoter and Licensee as provided in Paragraph 3 of this Agreement. Licensee shall advance all required costs, expenses, and attorneys' fees necessary for anti-piracy enforcement under this Paragraph, subject to recoupment from any application recovery, and shall report all expenses, settlements and recoveries to Promoter on a quarterly basis. Licensee's sublicensees shall have no right to commence or settle any claim or litigation arising out of the alleged piracy of the telecast hereunder without the prior written consent of Promoter.

9.    **Attachments.**    Annexed to this Agreement as exhibits are the following documents, the terms and conditions of which are incorporated herein as if set forth in their entirety:

a.    Exhibit A: Statement of Work 1 ("SOW 1"), which shall apply to this Agreement, is deemed to incorporate by reference any and all terms and conditions of this Agreement.

b.    Exhibit B: Statement of Work 2 ("SOW 2"), which shall apply to this Agreement, is deemed to incorporate by reference any and all terms and conditions of this Agreement

c.    Exhibit C: Standard Terms and Conditions which shall apply to this Agreement.

10.    **Term and Termination.**   The term of this Agreement shall be for the period commencing on the Effective Date and ending December 31, 2019 (the "Term"), unless extended in writing by mutual agreement of the parties.

11.    **Defaults.**

a.    Licensee's failure to deliver the Minimum Guarantee as provided in Paragraph 4 hereof or to pay the license fee as provided in Paragraph 3 hereof or to pay the signal delivery fees or equipment expenses as provided in Paragraph 5 hereof or to comply with any other term or condition of this Agreement or of an applicable SOW, the annexed agreements or Standard Terms and Conditions shall permit Promoter, in addition to all of its other rights and remedies: (i) to cancel this Agreement with Licensee at any time without any further liability or obligation to Licensee and (ii) to retain all monies paid to Promoter prior to such cancellation. Provided, however, that before Promoter may exercise any remedy with respect to any such default, Promoter

must (i) provide Licensee with written notice specifying such default, and (ii) if and to the extent that time reasonably permits prior to the Event, provide Licensee with up to seven (7) days after Licensee's receipt of such default notice within which to cure such default.

        b.    If, in violation of the provisions of this Agreement, Licensee or a sublicensee exhibits the Event in an outlet with a fire code occupancy limit in excess of 500 persons (except casino locations), then, in addition to the license fee for such outlet as provided in Paragraph 3, and in addition to and not in limitation of or in lieu of any other rights or remedies Promoter may have under this Agreement, at law or in equity, including, without limitation, Promoter's rights to indemnification hereunder, Licensee shall immediately pay to Promoter an amount equal to the following for each such outlet that violates the aforesaid restriction: the sum of the fire code occupancy capacity of the outlet multiplied by 50% of the face amount of the highest ticket or admission price for the Event at that outlet, Licensee agree that this payment is reasonably calculated to reimburse Promoter for its damages in the event of such violation of this Agreement.

12.    **Reports, Collection and Accounting.**

        a.    Licensee shall be responsible for collection of all monies from sublicensees shall make all payments and provide all reports pursuant to Paragraph 4 of the Standard Terms and Conditions (Exhibit B). Licensee shall distribute to Promoter all amounts due for exhibition rights to the Event, with no deduction, set-offs or holdbacks whatsoever.

        b.    In addition to the reports required in the Standard Terms and Conditions, for each Event, Licensee shall, within twenty (20) business days of the Event, provide DAZN with a written report setting out:

        i.    a list of all participating Commercial Premise that licensed the Event;
        ii.    method of signal delivery to each participating Commercial Premise; and
        iii.    sublicensee fees that Licensee received from each Commercial Premises and any outstanding fees;
        iv.    report identifying expenses and revenue split above Minimum Guarantee;
        v.    the list of all commercial premises that displayed the Events without obtaining a sublicense.

        c.    DAZN shall be granted audit rights in connection with review of all records related to each Event.

        d.    Promoter's representatives shall have the right to visit Licensee's offices and each Commercial Premise at any time prior to the Event and after the Event to obtain and verify information, in person or electronically, and to make arrangements for the payment of all license fees due to Promoter promptly following the Event.

13.    **Indemnification.** Licensee and DAZN shall each indemnify and hold the other, the other's parent and affiliated companies, and their respective officers, directors, employees and agents harmless from any and all claims, costs, liabilities, judgments, expenses or damages (including reasonable attorneys' fees) either party may incur, due to any negligent or wrongful acts or omissions, including but not limited to breach of this Agreement, of the indemnifying party, its agents or employees, in the performance of its obligations hereunder. In any case in which

7

indemnification is sought hereunder the party requesting indemnification shall promptly notify the other of any claim for litigation to which the indemnification relates, and the party requesting indemnification shall afford such party the opportunity to participate in and at such party's option, fully control any compromise, settlement, litigation or other resolution or disposition in such claim or litigation. The provisions of this Paragraph shall survive the termination and/or expiration of the Agreement.

14.    **Notices.** All contracts and reports shall be sent to:

If to DAZN:

Perform Investment Limited
1 World Trade Center, 72nd Floor
New York, NY 10007
Attn: Tom Constabile, VP Business Development
Tom.Constabile@dazn.com

With a copy to: Sunjay Mathews, Head of Legal, North America
Sunjay.Mathews@dazn.com

If to G&G:

Nicolas J. Gagliardi
G & G Closed Circuit Events, LLC
2925 Green Valley Parkway, Suite D
Henderson, NV 89014
nick@gcccevents.com

With a copy to: Thomas P. Riley, Esquire
tprlaw@att.net

15.    **Confidentiality.** Neither party shall disclose to any third party (other than its employees and agents, in their capacity as such, on a need-to-know basis), any information with respect to the terms and provisions of this Agreement except: (i) to the extent necessary to comply with law or the valid order of a court of competent jurisdiction, in which event the party seeking disclosure shall so notify the other party as promptly as practicable (if possible, prior to making such a disclosure), (ii) as part of normal reporting or review procedure to its banks, auditors and attorneys and similar professionals, provided that such banks, auditors, attorneys and similar professionals agree to be bound by the provisions of this paragraph, and (iii) in order to enforce its rights pursuant to this Agreement.

16.    **Entire Agreement.** This Agreement supersedes and terminates all prior agreements between the parties hereto and their affiliates with respect to the subject matter contained herein, and this Agreement embodies the entire understanding between the parties relating to such subject matter, and any and all prior correspondence, conversations and memoranda are merged herein and shall be without effect hereon. It may not be altered, amended

8

or discharged, except by a subsequent writing signed by the parties hereto. The laws of the State of New York applicable to contracts executed and to be fully performed in the State of New York shall govern this agreement, and execution of the agreement shall constitute the consent of Licensee and any sublicensee to exclusive jurisdiction of New York. Any dispute, controversy or claim arising out of or relating to this Agreement, including the formation, interpretation, breach or termination thereof, including whether the claims asserted are arbitrable, will be referred to and finally determined by arbitration in accordance with the JAMS Commercial Arbitration Rules before a single arbitrator who shall be selected by the parties to the arbitration and who shall be a retired judge or justice. If the parties are unable to select an arbitrator, the arbitrator will be selected in accordance with the JAMS Rules. The place of arbitration will be New York, New York. Judgment upon the award rendered by the arbitrator(s) may be entitled to its reasonable costs, including the costs of arbitration, and attorneys' fees. The prevailing party in arbitration shall be entitled to its reasonable costs, including the costs of arbitration and attorneys' fees.

IN WITNESS WHEREOF, the undersigned have caused this Master Services Agreement to be duly entered into as of the Effective Date.

G&G CLOSED CIRCUIT EVENTS, LLC          PERFORM INVESTMENT LIMITED

By:_____              By:_____
Name: Nicolas J. Gagliardi              Name:  Paul Morton
Title:  President                       Title:  EVP, Finance

BY SIGNING THIS AGREEMENT, LICENSEE ACKNOWLEDGES HAVING READ THE ATTACHED STANDARD TERMS AND CONDITIONS AND CONFIRMS ITS AGREEMENT THERETO. NO CHANGES ARE AUTHORIZED IN THE ATTACHED TERMS AND CONDITIONS UNLESS AUTHORIZED BY PROMOTER.

<u>Exhibit A</u>

Statement of Work 1 ("SOW 1")
Between
Perform Investment Limited and G&G Closed Circuit Events, LLC
Effective Date: May 1, 2019

Pursuant to that certain Master Services Agreement (the "MSA") with an effective date of May 1, 2019, by and between the parties thereto, this SOW is entered into by and between Perform Investment Limited a company incorporated and existing under the laws of England and Wales with company number 09676399, whose registered office is at Hanover House, Plane Tree Crescent, Feltham TW13 7BZ, England ("DAZN" or "Promoter"), and G&G Closed Circuit Events, LLC a company incorporated and existing under the laws of Nevada whose registered office is at 2925 Green Valley Parkway, Suite D, Henderson, Nevada 89014 ("G&G" or "Licensee") ("G&G" or "Licensee") for the provision of the services and/or goods as described below. This SOW shall become effective and enforceable upon signature of both parties.

This SOW 1 is deemed to incorporate by reference any and all terms and conditions of the MSA. If there is any inconsistency or contradiction between the MSA and the SOW, the terms of this SOW shall prevail.

1. <u>Event 1</u>
Event 1 is the Saul Alvarez vs. Daniel Jacobs boxing match, scheduled 12 round WBA, WBC IBF Middleweight Championship Bout, including selected undercard bouts (**Fighters are subject to change**).
Venue: T-Mobile Arena, Las Vegas, NV.
Event Date: Saturday, May 4th, 2019.

**Minimum Guarantee:** Pursuant to Paragraphs 3 and 4 of the MSA, Licensee shall pay Promoter ⋅ not later than one (1) business day prior to Event 1 (prior to May 4, 2019).

**First profit window to G&G:** Pursuant to the MSA, the first            in gross revenue in excess to the Minimum Guarantee shall be retained by G&G.

**Revenue Share:** Pursuant to the MSA, the remaining balance of gross revenue shall be split        to DAZN and       to G&G.

**Rate Card for Event 1:**

| Capacity | Pricing |
|---|---|
| 1 to 50 | $875 |
| 51 to 100 | $1250 |
| 101 to 200 | $2,500 |
| 201 to 300 | $3,750 |

| 301 to 400 | $5,000 |
| 401 to 500 | $6,250 |

- Rate based on $12.50 per head
- Activation Fee of $250 needs to be added to pricing
- Cable Clients: Provider will bill Activation Fees directly

Reserved rights:
- theaters;
- arenas;
- racetracks;
- hotel rooms;
- transportation;
- casinos in Las Vegas.

Black Spot List for Event 1: None.

## Exhibit B

### Statement of Work ("SOW 2")
### Between
### Perform Investment Limited and G&G Closed Circuit Events, LLC
### Effective Date: May 30, 2019

Pursuant to that certain Master Services Agreement (the "MSA") with an effective date of May 1, 2019, by and between the parties thereto, this SOW is entered into by and between Perform Investment Limited a company incorporated and existing under the laws of England and Wales with company number 09676399, whose registered office is at Hanover House, Plane Tree Crescent, Feltham TW13 7BZ, England ("DAZN" or "Promoter"), and G&G Closed Circuit Events, LLC a company incorporated and existing under the laws of Nevada whose registered office is at 2925 Green Valley Parkway, Suite D, Henderson, Nevada 89014 ("G&G" or "Licensee") ("G&G" or "Licensee") for the provision of the services and/or goods as described below. This SOW shall become effective and enforceable upon signature of both parties.

This SOW 2 is deemed to incorporate by reference any and all terms and conditions of the MSA. If there is any inconsistency or contradiction between the MSA and the SOW, the terms of this SOW shall prevail.

### 2.  Events 2 & 3

Event 2 is the Anthony Joshua vs. Andy Ruiz, Jr. boxing match, scheduled 12 round WBA, WBO, IBF Heavyweight Championship Bout, including selected undercard bouts (**Fighters are subject to change**).
Event 2 Venue: Madison Square Garden, New York, NY.
Event 2 Date: Saturday, June 1st, 2019.

Event 3 is the Gennady Golovkin vs. Steve Rolls boxing match, scheduled 12 round bout, including selected undercard bouts (**Fighters are subject to change**).
Event 3 Venue: Madison Square Garden, New York, NY.
Event 3 Date: Saturday, June 8th, 2019.

**Minimum Guarantee:** Pursuant to Paragraphs 3 and 4 of the MSA, Licensee shall pay Promoter not later than one (1) business day prior to Event 3 (prior to June 7, 2019).

**First profit window to G&G:** Pursuant to the MSA, the first          in gross revenue in excess to the Minimum Guarantee shall be retained by G&G.

**Revenue Share:** Pursuant to the MSA, the remaining balance of gross revenue shall be split      to DAZN and      to G&G.

Rate Card for Event 2:

| Capacity | Pricing |
| --- | --- |
| 1 to 50 | $400 |
| 51 to 100 | $800 |
| 101 to 200 | $1,600 |
| 201 to 300 | $2,400 |
| 301 to 400 | $3,200 |
| 401 to 500 | $4,000 |

Rate Card for Event 3:

| Capacity | Pricing |
| --- | --- |
| 1 to 50 | $300 |
| 51 to 100 | $600 |
| 101 to 200 | $1,200 |
| 201 to 300 | $1,800 |
| 301 to 400 | $2,400 |
| 401 to 500 | $3,000 |

Rate Card for Combination Event 2 & 3:

| Capacity | Pricing |
| --- | --- |
| 1 to 50 | $1,000 |
| 51 to 100 | $1,600 |
| 101 to 200 | $2,800 |
| 201 to 300 | $4,000 |
| 301 to 400 | $5,200 |
| 401 to 500 | $6,400 |

- Activation Fee of $250 needs to be added to pricing
- Cable Clients: Provider will bill Activation Fee directly.
- Texas locations must add 3% State tax
- Casinos $15 per head, a minimum of 300 persons for $4,500

Black Spot List for Events 2 & 3:
Black Spot List to be discussed and mutually agreed on prior to the Event.

13

## Exhibit C

## STANDARD TERMS & CONDITIONS

Perform Investment Limited, d/b/a DAZN ("Promoter") has agreed to grant G&G Closed Circuit Events, LLC ("Licensee") pursuant to the Master Services Agreement (the "Agreement" or "MSA") to which these Standard Terms & Conditions are annexed certain rights to exhibit and license others to the Promoter's scheduled telecast of the Events pursuant to each SOW.

The Events shall be promoted by Promoter.

The provisions of these Standard Terms & Conditions shall apply to both Licensee and authorized sublicensees as appropriate, and to the extent they are applicable, the terms of these Standard Terms & Conditions shall be incorporated by reference into all Licensee's sublicense agreements for the Event.

THE RECEPTION AND EXHIBITIONS OF THE TELECAST OF THE EVENTS BY LICENSEE OR ANY PERMITTED SUBLICENSEES SHALL BE SUBJECT TO THE FOLLOWING TERMS & CONDITIONS:

1.   Limited Rights
    (a)      With the exception of the Anti-Piracy Enforcement provisions set forth in Paragraph 8 of the MSA, which specifically allows Licensee the right to prosecute claims of unauthorized exhibition of the Events by the operators of the Commercial Premises that obtain signal or transmission of the Events on a delayed basis (i.e., international feeds, replay, private media, etc.) all other rights and licenses herein granted to Licensee are solely for the live exhibitions simultaneous with the Events, as provided in the MSA
    (b)      The term "Closed Circuit Basis" shall mean exhibition of the Events at any non-residential locations not specifically excluded in the MSA or an applicable SOW (the "Outlets") located within the Territory sublicensed by Licensee.
    (c)      This license does not grant Licensee or any sublicensee the right to record, duplicate or copy the Events by means whatsoever, or to exhibit, authorize or permit the recording, reproduction or retransmission of the Events or any portion thereof.
        (i)    Licensee may sublicense the exhibition of the Events, pursuant to the terms and conditions of the Master Services Agreement and these Standard Terms and Conditions. .
        (ii)   Licensee or any sublicensee shall not have or exercise any rights whatsoever with respect to the Events other than those specifically licensed to it; and in no event shall sublicensee have the right to further sublicense any exhibition or other right to the Events. Upon any material breach of this Paragraph 1, Promoter shall have all of its rights and remedies at law and equity, including, without limitation, the right to enjoin any exhibition or exploitation of the Events; suspend the transmission of the Events to Licensee or any sublicensee; terminate this license and/declare the Master Services Agreement and these Standard Terms and Conditions breached, declare all amounts payable hereunder, retain all monies paid to Promoter prior to the breach, and exercise all rights and remedies on account of such breach, including, without limitation, the right to recover damages caused to Promoter in connection with such breach.

14

(d)    Licensee and any sublicensees shall use their best efforts to employ adequate security systems and other measures to prevent theft, pirating, copying, duplication or unauthorized exhibition or transmission of the Events.

2.    Delivery of Signal.

(a)    Promoter shall be responsible for the delivery of the broadcast quality video and audio signal of the telecast of the Events in their entirety to communications satellites or other transmission facilities (to be selected by Promoter). Such communications satellites or other transmission facilities shall constitute full and complete discharge of the obligations of Promoter to Licensee hereunder. The signal shall be delivered in compressed format, utilizing PGCA conditional access technology or the current equivalent.

(b)    Licensee or its sublicensees shall be responsible to ensure delivery of the video and audio signal from the Delivery Point to the receiving device outlets, and each sublicensee shall be responsible for reception of the signal and for projection at their Outlets.

(c)    If the Event is not transmitted to the Delivery Point for any reason beyond the reasonable control of Promoter, Promoter shall not be in breach of these Standard Terms & Conditions. Promoter shall also not have any responsibility for any failure of the live transmission resulting from inclement weather, failure of the satellite, or failure of any services or equipment, as Licensee shall insure against all such occurrences at its own expense as provided below. If the Event is rescheduled to a date other than the telecast date in accordance with the provisions of Paragraph 14 below, and is telecast by Promoter on said rescheduled date, then the telecast shall not be deemed to have completely or partially omitted.

(d)    If any omission or impairment of the telecast for any of the aforesaid reasons in partial, or is for any reason caused at the production point, transmission point of delivery point or Delivery Point, or at an Outlet, or between the production point and an Outlet, including but not limited to said facilities and any reception, encoding, decoding, projection or transmission services and equipment, Licensee shall nevertheless report and make payments to Promoter as required without regard to any allowances, adjustments or refunds given by Licensee.

(e)    If the event is not transmitted to the Delivery Point for any reason beyond the reasonable control Promoter, or if any omission or impairment of the telecast for any of the aforesaid reasons is partial, or is for any reason caused at the production point and an Outlet, or between the production point and an Outlet, including but not limited to said facilities and any reception, encoding, decoding, projection or transmission services and equipment, sublicensee shall hold Promoter and Licensee harmless from any and all damages, expenses and costs, and sublicensee's sole and exclusive remedy is a reimbursement of its licensing fee.

3.    Telecast Facilities and Technical Services.

(a)    Licensee and each sublicense shall obtain and provide at their cost and expense a television satellite reception facility or other signal reception or connection facility acceptable to Promoter, for each Outlet and signal decoder if required (herein referred collectively as ("such facilities") necessary to receive and decode the video and audio signal of the telecast from the Delivery Point to the Outlet, as provided in the Master Services Agreement. Promoter shall not have any ability by reason or delay, damage or failure of the entity from which such facilities are ordered to furnish the same, nor by reason of the unavailability or any failure of such facilities.

15

(b)     As applicable, Licensee and each sublicensee shall provide, and Licensee shall arrange for authorization of the compatible decoding equipment or authorization as provided in the MSA.

(i)  Promoter has not made representation, warranty or covenant, express or implied, with respect to the delivery, installation, merchantability, fitness, condition, quality, durability, suitability or compatibility of the decoding equipment for any purposes, or any other representation, warranty or covenant, express or implied, with respect to the decoding equipment or such facilities or any part thereof; and Licensee and sublicensee release Promoter from any and all liability with respect thereto and for any malfunction or failure of the equipment to operate as may be represented by the manufacturer of the equipment.

(c)     It shall be further obligation of Licensee and each sublicensee to obtain and provide at their sole cost and expense everything else, including, but not limited to, materials and personnel of any necessary for the reception, projection, exhibition, and presentation of the telecast for transmission before paying audiences at the Outlets and for Installation testing and operation of the equipment.

4.     License Fee Reports, Verification
(a)     In consideration for the rights herein granted to Licensee, Licensee shall pay to Promoter the license fee set forth in Paragraphs 3 & 4 of the Master Services Agreement. All license fees due Promoter (in excess of any Minimum Guarantee) shall be remitted not later than twenty (20) business day after the Events.

(b)     Promoter and authorized representatives shall have the right at any time before, during and after the telecast of the Events, to enter the Outlets and inspect the conduct of the telecast therein, the systems and procedures for box office sales and collections and to inspect, audit and make excerpts from the books and records of Licensee at the Licensee's offices, and at the offices of sublicensees, at any time during business hours, relating to the telecast, in person or electronically (each an "Audit"). In the event that such Audit reveals a deficiency between the amount due to Promoter and the amount actually paid by Licensee, within thirty (30) days of Licensee's receipt of written of any such deficiency, Licensee shall pay the amount of the deficiency together with interest thereon at a rate per annum of five (5%) from the date such payment was originally due until the date of actual payment. Should any such Audit establish a deficiency of three percent (3%) or more, in addition to paying the amount of the deficiency together with interest thereon, Licensee shall pay for the costs of such Audit. For this purpose Licensee and each sublicensee shall keep full and complete books and records of all tickets sales and gross receipts at each Outlet, or the lump sums or guaranteed minimum payment from each sublicensee, and shall maintain such books and records for the period of three (3) years after the Event. Promoter and its authorized representatives shall likewise have the right to receive from Licensee by personal delivery on and after the times specified in subparagraphs (b) (i) and (ii), copies of each of the respective reports Licensee and each sublicensee is required to send Promoter pursuant to said subparagraphs and to examine, and make copies of, the books and records of Licensee and each sublicensee relating to gross revenues from the Event.

(c)     Any damages, whether statutory, compensatory, punitive or otherwise, which Licensee may recover from the theft, piracy, copying, duplication, unauthorized exhibition or transmission of the Event in the Territory after payment of costs, expenses, and attorneys' fees, shall be included in the license fees payable to Promoter hereunder. That is, Licensee shall pay to

16

Promoter a percentage of such net recovered damages equal to the percentage that would have been payable to Promoter if such damages had been receipts of sublicensing revenue from Outlets in the Territory.

5.    Telecast: Sponsorship

The Telecast of the Events will contain commentary relating to the Event, between rounds and between bouts, so that the telecast will consist of continuous programming of network quality. Promoter reserves the right to license the display of commercial material on the ring mat, ring post corner pads, and clothing and equipment of the participants and to include commercial and promotional spots, announcements and material in the telecast, including with respect to such sponsors as Promoter may select without regard to any competing sponsorship arrangements of Licensee or any sublicensee.

6.    Covenants, Representations and Warranties

(a)    By Promoter:

(i)    Promoter represents and warrants that it has all requisite power and authority to grant to Licensee the rights and license contemplated in the Master Services Agreement and these Standard Terms and Conditions.

(b)    By Licensee and each authorized sublicensee:

(i)    No Licensee or authorized sublicensee shall record, edit or alter in any way the telecast of the Events as provided by Promoter.

(ii)    Licensee and each authorized sublicensee shall be responsible for all royalties, reports and payments with respect to performance by exhibition over their facilities of the musical compositions included in the telecast of the Events.

(iii)    No Licensee or authorized sublicensee shall insert any advertising or promotional material in the telecast of the Events.

(iv)    Licensee and each authorized sublicensee represent and warrant that it has all requisite power and authority to enter into and perform the obligations provided in the Master Services Agreement and these Standard Terms & Conditions.

(v)    Licensee and each authorized sublicensee shall comply with restriction set forth in Paragraph 9(b) of these Standard Terms & Conditions.

7.    Advertising, Publicity and Promotion.

(a)    Promoter and parties authorized by Promoter shall advertise, publicize and promote the Events nationally and/or locally to extent and in such manner as Promoter may determine in its discretion, and at Promoter's sole cost and expense.

(b)    Licensee each and sublicensee shall, at their sole cost and expense, promote, publicize and advertise the Events.

(c)    Licensee shall exert its best efforts to market and advertise the Event in order to maximize sublicensing revenue from the outlets.

(d)    The telecast delivered by Promoter shall be exhibited in its entirety without alteration or change of any nature. Other than advertising of the telecast itself, Licensee shall not authorized or permit any advertising, commercial sponsorship or tie-ins of or in connection with the telecast addressed to audiences of the telecasts of the Events.

(e)    Licensee agrees to use such advertising, publicity and promotional material as Promoter may, in its discretion, make available without cost. All promotional material, publicity and advertising used, authorized or distributed by Licensee shall:

     (i)    Be subject to the reasonable approval of Promoter.

     (ii)    Contain no testimonial or endorsement of any product or service.

     (iii)    Conform to accepted standards of propriety and not be derogatory to, or ridicule, Promoter, the site, any television distributor, the fighters or anyone else.

     (iv)    Terminate upon completion of the Event.

     (v)    Not contain any reference to any other attraction similar to the Event, nor to any product, service, company or corporation not approved in writing by Promoter.

     (vi)    Contain such publicity credits as Promoter shall advise.

     (vii)    Not alter or change the symbol, logo, trademark or service mark of Promoter.

     (vii)    Comply with all restrictions or limitations advised by Promoter with respect to materials provided by Promoter.

In promoting, publicizing and advertising the Events, Licensee may use the names, photographs and biographical material of the participants in the Events, and the promoter of the Events, only as furnished by Promoter or upon Promoter's written approval, provided that the same is used only on the telecast or in connection with the sponsorship thereof or advertising, promotion and publicity of the telecast, but Licensee may not use or authorize the use of the foregoing for purposes of endorsement of any commercial product or service.

    8.    **Merchandise and Programs: Sponsorship.**

     (a)    Licensee and any sublicensees may not sell or distribute any programs, other publications, or other merchandise relating to the Events or the telecast thereof; provided, however, that if Promoter or its designated representative should make available programs or other merchandise, then the same may be purchased by Licensee at the regularly established wholesale price, and may be given away or resold by Licensee to the persons attending the exhibition at Outlets.

     (b)    Licensee and any sublicensees shall not sell, license or permit any sponsorship or advertising rights to the telecast of the Events at Outlets or casino or hotel, or any other entity which conducts a business in the same field as any sponsor approved by Promoter for the Events.

    9.    **Receipts in Trust.**    The portion of any gross receipts due Promoter, until delivered to Promoter, shall be held in trust by Licensee as the property of Promoter until such payment is made. The trust nature of such fund shall not be questioned whether the monies are physically segregated or not.

    10.    **Taxes.**

Licensee hereby covenants and agrees to pay, without limitation, any and all taxes, assessments, levied or charges (however denominated) imposed, levied or assessed by any statute, law, rule or regulation now in effect or hereafter enacted (including, without limitation, ticket taxes, gross receipts, sales, use, GST, property and excise or other similar taxes, license, provincial, territorial, city, athletic commission, boxing telecast or other taxes, howsoever denominated and regardless of to whom the applicable regulation assigns responsibility for payment) on or otherwise in respect of tickets of admission to the Outlets relating to the telecast of the Event or other materials relating thereto, or any right or privilege to use the same, or any receipts, fees, charges, monies, or other sums received or payable in connection with the exhibition and/or exploitation thereof whether or not billed to, or demanded of, Promoter, or with respect to any monies payable to Promoter hereunder; it being the intent hereof that, unless otherwise expressly agreed by

Promoter in writing, the license fee specified as the consideration for the license granted herein shall be net amounts which are free and clear of, and unreduced by, any tax, levy or charge whatsoever kind or nature and howsoever denominated.

11.    Reserved Rights.

All rights of any kind whatsoever in the Events and the telecast other than the rights specifically granted herein (including, without limitation of the foregoing, the rights to license transmissions via direct broadcast satellite services to receive-only satellite antennas (HTVRO) and for transmission to hotel guest rooms, as well as all other electronic and online internet rights) are hereby expressly reserved by Promoter in the MSA (including in Paragraph 2 of the MSA) and any applicable SOW, and may be fully exploited by Promoter and its licensees, except as expressly agreed otherwise in the MSA without regard to whether any such rights shall be competitive with those granted to Licensee. Promoter shall retain all rights, title and interest in and to its telecast of the Events and all recordings thereof (and all portions and elements thereof) including, without limitation, all copyrights, with the exception of those set forth in the Paragraph 8 of the MSA regarding Anti-Piracy Enforcement for the duration of the MSA Agreement, (and all extensions, renewals and/or reversions thereof), trademarks and all other property rights of any kind whatsoever therein whether now known or hereafter recognized.

12.    Postponement or Cancellation.

Promoter may, in its sole and absolute discretion, cancel or postpone the date or time of the Events at any time, for any reason whatsoever without liability to Licensee with respect to any expenses of any kind incurred by Licensee in connection with the Events, with the exception of the Minimum Guarantee which shall be returned within thirty (30) days of such cancellation.

13.    Other Agreements.

Licensee acknowledges that the rights being granted hereunder are granted to Promoter under separate written agreements with Promoter and Promoter's agreements with other parties. In the event that any such agreement is terminated for reasons beyond Promoter's control, then Promoter shall have the right to terminate this license without any obligation to Licensee or any sublicensee.

14.    Indemnification.

(a)    Licensee and each authorized sublicensee assume liability for, and shall indemnify, defend, protect, save and hold harmless Promoter and its parents, subsidiaries, and affiliated companies, distributors, assigns, licensees and the respective shareholders, directors, officers, employees and agents of the foregoing (the "Promoter Indemnified Parties") from and against any and all claims, actions, suits, costs, liabilities, judgments, obligations, losses, penalties, expenses or damages (including, without limitation, legal fees and expenses) of whatsoever kind and nature imposed on, uncured by or asserted against any of the Promoter Indemnified Parties arising out of, or related to any breach, or alleged breach by the indemnifying party of any representation, warranty or covenant made, or obligation assumed, by the indemnifying party pursuant to this Agreement. The provisions of this subparagraph shall apply, without limitation, to claims brought by Promoter against Licensee or a sublicensee.

(b)    Promoter assumes liability for, and shall indemnify, defend, protect, save and hold harmless Licensee, its parents, subsidiary and affiliated companies, distributors, assigns, licensees and the respective shareholders, directors, officers, employees and agents of the foregoing (the "Licensee Indemnified Parties") from and against any and all claims, actions, suits, costs, liabilities, judgments, obligations, losses, penalties, expenses or damages (including, without limitation, legal fees and expenses) or whatsoever kind and nature imposed on, incurred

19

by or asserted against any of the Licensee Indemnified Parties arising out of or related to any breach or alleged breach by Promoter of any representation, warranty or covenant made, or obligation assumed, by Promoter pursuant to his Agreement. The provisions of this subparagraph shall apply, without limitation, to claims brought by Licensee against Promoter.

(c)   In order to seek or receive indemnification hereunder in cases involving third-party claims:

(i)   The party seeking indemnification (the "**Indemnitee**") must have promptly notified the other (the "**Indemnitor**") of any claims or litigation of which it is aware to which the indemnification relates; and

(ii)   With regard to any claim or litigation to which the Indemnitor itself is not a party, the Indemnitee must have afforded the Indemnitor the opportunity to participate in any compromise, settlement, litigation or other resolution or disposition of such claim or litigation.

(d)   No patron or viewer shall be deemed to have any privity of contract or direct contractual relationship with Promoter by virtue of this license or a permitted sublicensee. In no event shall Promoter be deemed to have any obligation to, or Licensee or a sublicensee have any right as against Promoter, with respect to any patron or viewer. Licensee and each sublicensee hereby acknowledge that it, and not Promoter, shall be fully responsible for all claims brought by patrons or viewers with respect to the showing of or the failure to show the Events licensed hereunder.

15.   No Assignment.

Neither the Master Services Agreement nor any right hereunder may be assigned by Licensee or any sublicensee. Promoter may assign the Master Services Agreement to any parent, subsidiary or affiliated entity, but same shall not relieve Promoter of any obligations hereunder.

16.   Not an Agency Agreement.

Nothing herein contained shall be deemed to constitute either of the parties a joint venture or partner or agent of the other, and neither Promoter nor Licensee shall hold themselves out as such. Neither party shall become liable by reason of any representation, act or omission of the other contrary to the provisions hereof.

17.   Subject to Applicable Laws.

Nothing herein contained shall require the commission of any act contrary to an express provision of law, or policy of law, or of any rule or regulation of any governmental authority, and if there shall exist any conflict between any provision of these Standard Terms & Conditions and any such law, policy, rule or regulation, the latter shall prevail, and the provision or provisions of this license so affected shall be curtailed, limited of eliminated to the extent necessary to remove such conflict and as so modified these Standard Terms & Conditions shall continue in full force and effect.

18.   Notices.

All notices required to be given pursuant to these terms and conditions shall be sent certified mail, return receipt requested, or delivered by messenger or by email, and shall be deemed given on the third day after mailing or on the day of such messenger or email delivery. Said notices shall be sent to the following addresses:

If sent to Promoter:

20

Perform Investment Limited
1 World Trade Center, 72nd Floor
New York, NY 10007
Attn: Tom Constabile, VP Business Development
Tom.Constabile@dazn.com

With a copy to: Sunjay Mathews, Head of Legal, North America
Sunjay.Mathews@dazn.com

If sent to Licensee:

Nicolas J. Gagliardi
G & G Closed Circuit Events, LLC
2925 Green Valley Parkway, Suite D
Henderson, NV 89014
nick@ggccevents.com

With a copy to: Thomas P. Riley, Esquire
tprlaw@att.net

19.    Effectiveness.

These Standard Terms & Conditions, the Master Services Agreement, and its Exhibits constitute the full agreement and complete understanding between the parties with respect to the subject matter and supersedes any and all prior understandings, whether written or oral, pertaining to the subject matter hereof and cannot be modified except by a written instrument signed by all parties hereto.

20.    General Provisions.

The invalidity of any provisions of these Standard Terms & Conditions shall not affect the validity of all of its remaining provisions. All prior representations and agreements between the parties relating to the subject matter hereof are merged into this instrument, which may not be modified except by written agreement signed by both parties. The laws of the State of New York applicable to contracts executed and to be fully preformed in the State of New York shall govern these Terms and Conditions and execution of the Master Services Agreement shall constitute the consent of Licensee and any sublicensee to exclusive jurisdiction of New York. Any dispute, controversy or claim arising out of or relating to these Terms and Conditions, including the formation, interpretation, breach or termination thereof, including whether the claims asserted are arbitrable, will be referred to and finally determined by arbitration in accordance with the JAMS Commercial Arbitration Rules before a single arbitrator who shall be selected by the parties to the arbitration and who shall be a retired judge or justice. If the parties are unable to select an arbitrator, the arbitrator will be selected in accordance with the JAMS Rules. The place of arbitration will be New York. Judgment upon the reward rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The prevailing Party in arbitration shall be entitled to its reasonable costs, including the costs of arbitration, and attorneys' fees. Paragraph headings

21

are for the guidance of the reader only and shall be of no effect in construing the contents of the respective Paragraphs.

21.  No Representation Regarding Events.

Licensee understands and acknowledges that the Master Services Agreements involve live sporting Events, and as such, that no representation or warranties are being made concerning what may occur at said Events, and that the Events may end in knockout, technical knockout, disqualification, decision, or otherwise and that there shall be no cause of action, chargeback, or set-off against Promoter by virtue of the conduct of the participants to the Events.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///



## CLOSED CIRCUIT EVENTS

Rate Card for May 4th DAZN Alvarez vs. Jacobs Event

| Capacity | Pricing | |
|---|---|---|
| 1 to 50 | $875 | * Remember to include |
| 51 to 100 | $1,500 | activation fee if you are |
| 101 to 200 | $2,750 | using the per head rate |
| 201 to 300 | $4,000 | calculation for the location |
| 301 to 400 | $5,250 | |
| 401 to 500 | $6.500 | |

-Rate based on $12.50 per head
- Activation Fee is $250 and is included in the price
- Cable Clients: Provider will bill Activation Fee directly.
- Texas locations must add 3% State tax
- Casinos $20 per head, a minimum of 300 persons for $6,000 (Refer to Guy Laughridge
- Refer Las Vegas locations to home office

JS 44C/SDNY
REV.
10/01/2020

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

**PLAINTIFFS**
G & G Closed Circuit Events, LLC

**DEFENDANTS**
Ashleigh Bertolini, et al

**ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER**
ML Zager, PC, 461 Broadway, PO Box 948 Monticello NY 12701 (845) 794-3660

**ATTORNEYS (IF KNOWN)**

**CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Violation of Telecommnications Statute Title 47 Sections 553 and 605

Has this action, case, or proceeding, or one essentially the same been previously filed in SDNY at any time? No ☑ Yes ☐    Judge Previously Assigned

If yes, was this case  Vol. ☐  Invol. ☐   Dismissed. No ☒  Yes ☐   If yes, give date _____ & Case No. _____

Is this an International Arbitration Case?    No ☒    Yes ☐

(PLACE AN [x] IN ONE BOX ONLY)    NATURE OF SUIT

|  | TORTS |  |  |  | ACTIONS UNDER STATUTES |
|---|---|---|---|---|---|
| **CONTRACT** | **PERSONAL INJURY** | **PERSONAL INJURY** | **FORFEITURE/PENALTY** | **BANKRUPTCY** | **OTHER STATUTES** |

**CONTRACT**
[ ] 110 INSURANCE
[ ] 120 MARINE
[ ] 130 MILLER ACT
[ ] 140 NEGOTIABLE INSTRUMENT
[ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
[ ] 151 MEDICARE ACT
[ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS)
[ ] 153 RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS
[ ] 160 STOCKHOLDERS SUITS
[ ] 190 OTHER CONTRACT
[ ] 195 CONTRACT PRODUCT LIABILITY
[ ] 196 FRANCHISE

**REAL PROPERTY**
[ ] 210 LAND CONDEMNATION
[ ] 220 FORECLOSURE
[ ] 230 RENT LEASE & EJECTMENT
[ ] 240 TORTS TO LAND
[ ] 245 TORT PRODUCT LIABILITY
[ ] 290 ALL OTHER REAL PROPERTY

**PERSONAL INJURY**
[ ] 310 AIRPLANE
[ ] 315 AIRPLANE PRODUCT LIABILITY
[ ] 320 ASSAULT, LIBEL & SLANDER
[ ] 330 FEDERAL EMPLOYERS' LIABILITY
[ ] 340 MARINE
[ ] 345 MARINE PRODUCT LIABILITY
[ ] 350 MOTOR VEHICLE
[ ] 355 MOTOR VEHICLE PRODUCT LIABILITY
[ ] 360 OTHER PERSONAL INJURY
[ ] 362 PERSONAL INJURY - MED MALPRACTICE

**ACTIONS UNDER STATUTES**

**CIVIL RIGHTS**
[ ] 440  OTHER CIVIL RIGHTS (Non-Prisoner)
[ ] 441 VOTING
[ ] 442 EMPLOYMENT
[ ] 443 HOUSING/ ACCOMMODATIONS
[ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT
[ ] 446  AMERICANS WITH DISABILITIES -OTHER
[ ] 448 EDUCATION

**PERSONAL INJURY**
[ ] 367 HEALTHCARE/ PHARMACEUTICAL PERSONAL INJURY/PRODUCT LIABILITY
[ ] 365 PERSONAL INJURY PRODUCT LIABILITY
[ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

**PERSONAL PROPERTY**
[ ] 370 OTHER FRAUD
[ ] 371 TRUTH IN LENDING
[ ] 380 OTHER PERSONAL PROPERTY DAMAGE
[ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY

**PRISONER PETITIONS**
[ ] 463 ALIEN DETAINEE
[ ] 510 MOTIONS TO VACATE SENTENCE 28 USC 2255
[ ] 530 HABEAS CORPUS
[ ] 535 DEATH PENALTY
[ ] 540 MANDAMUS & OTHER

**PRISONER CIVIL RIGHTS**
[ ] 550 CIVIL RIGHTS
[ ] 555 PRISON CONDITION
[ ] 560 CIVIL DETAINEE CONDITIONS OF CONFINEMENT

**FORFEITURE/PENALTY**
[ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
[ ] 690 OTHER

**PROPERTY RIGHTS**
[ ] 820 COPYRIGHTS
[ ] 830 PATENT
[ ] 835 PATENT-ABBREVIATED NEW DRUG APPLICATION
[ ] 840 TRADEMARK

**LABOR**
[ ] 710 FAIR LABOR STANDARDS ACT
[ ] 720 LABOR/MGMT RELATIONS
[ ] 740 RAILWAY LABOR ACT
[ ]  751 FAMILY MEDICAL LEAVE ACT (FMLA)
[ ] 790 OTHER LABOR LITIGATION
[ ] 791 EMPL RET INC SECURITY ACT (ERISA)

**IMMIGRATION**
[ ] 462 NATURALIZATION APPLICATION
[ ] 465 OTHER IMMIGRATION ACTIONS

**BANKRUPTCY**
[ ] 422 APPEAL 28 USC 158
[ ] 423 WITHDRAWAL 28 USC 157

[ ] 880 DEFEND TRADE SECRETS ACT

**SOCIAL SECURITY**
[ ] 861 HIA (1395ff)
[ ] 862 BLACK LUNG (923)
[ ] 863 DIWC/DIWW (405(g))
[ ] 864 SSID TITLE XVI
[ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
[ ] 870 TAXES (U.S. Plaintiff or Defendant)
[ ] 871 IRS-THIRD PARTY 26 USC 7609

**OTHER STATUTES**
[ ] 375 FALSE CLAIMS
[ ] 376 QUI TAM
[ ] 400 STATE REAPPORTIONMENT
[ ] 410 ANTITRUST
[ ] 430 BANKS & BANKING
[ ] 450 COMMERCE
[ ] 460 DEPORTATION
[ ] 470 RACKETEER INFLU-ENCED & CORRUPT ORGANIZATION ACT (RICO)
[ ] 480 CONSUMER CREDIT
[ ] 485 TELEPHONE CONSUMER PROTECTION ACT
[x] 490 CABLE/SATELLITE TV
[ ] 850 SECURITIES/ COMMODITIES/ EXCHANGE
[ ] 890 OTHER STATUTORY ACTIONS
[ ] 891 AGRICULTURAL ACTS
[ ] 893 ENVIRONMENTAL MATTERS
[ ] 895 FREEDOM OF INFORMATION ACT
[ ] 896 ARBITRATION
[ ] 899 ADMINISTRATIVE PROCEDURE ACT/REVIEW OR APPEAL OF AGENCY DECISION
[ ] 950 CONSTITUTIONALITY OF STATE STATUTES

Check if demanded in complaint:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $170000    OTHER _____

Check YES only if demanded in complaint
JURY DEMAND: ☐ YES ☒ NO

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y. AS DEFINED BY LOCAL RULE FOR DIVISION OF BUSINESS 13?
IF SO, STATE:

JUDGE _____    DOCKET NUMBER _____

NOTE: You must also submit at the time of filing the Statement of Relatedness form (Form IH-32).

(PLACE AN x IN ONE BOX ONLY)                                    **ORIGIN**

[X] 1 Original          [ ] 2 Removed from      [ ] 3 Remanded      [ ] 4 Reinstated or     [ ] 5 Transferred from    [ ] 6 Multidistrict         [ ] 7 Appeal to District
      Proceeding                State Court              from               Reopened                (Specify District)        Litigation                     Judge from
                                                        Appellate                                                               (Transferred)                Magistrate Judge
                        [ ] a. all parties represented   Court
                                                                                                                        [ ] 8 Multidistrict Litigation (Direct File)
                        [ ] b. At least one party
                              is pro se.

(PLACE AN x IN ONE BOX ONLY)                    **BASIS OF JURISDICTION**                        *IF DIVERSITY, INDICATE*
[ ] 1 U.S. PLAINTIFF    [ ] 2 U.S. DEFENDANT    [X] 3 FEDERAL QUESTION    [ ] 4 DIVERSITY       *CITIZENSHIP BELOW.*
                                                      (U.S. NOT A PARTY)

**CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)**

(Place an [X] in one box for Plaintiff and one box for Defendant)

| | PTF DEF | | PTF DEF | | PTF DEF |
|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ]1 [ ]1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ]3 [ ]3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ]5 [ ]5 |
| CITIZEN OF ANOTHER STATE | [ ]2 [ ]2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ]4 [ ]4 | FOREIGN NATION | [ ]6 [ ]6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

G & G Closed Circuit Events, LLC 2925 Green Valley Parkway, Suite D, Henderson, NV 89014 (Clark)

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

Ashleigh Bertolini, 3589 State Route 52 Pine Bush NY 12566 (Orange)
GLO 718 Corp., 4001 E Tremont Avenue Bronx NY 10465 (Bronx)

DEFENDANT(S) ADDRESS UNKNOWN
REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN
THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

**COURTHOUSE ASSIGNMENT**
I hereby certify that this case should be assigned to the courthouse indicated below pursuant to Local Rule for Division of Business 18, 20 or 21.

Check one:    THIS ACTION SHOULD BE ASSIGNED TO:    [X] WHITE PLAINS    [ ] MANHATTAN

DATE 08/05/21          SIGNATURE OF ATTORNEY OF RECORD          ADMITTED TO PRACTICE IN THIS DISTRICT
                                                                [ ] NO
RECEIPT #                                                       [X] YES (DATE ADMITTED Mo. _____ Yr. _____)
                                                                Attorney Bar Code #

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

Ruby J. Krajick, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

Clear Form          Save          Print