UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

G & G CLOSED CIRCUIT EVENTS, LLC,      Case No.: 21-cv-07351-DLC

                    Plaintiff,      PLAINTIFF'S AFFIDAVIT IN SUPPORT
                                       OF PLAINTIFF'S OPPOSITION TO
      - against -                  DEFENDANTS' MOTION FOR
                                       SUMMARY JUDGMENT

ASHLEIGHT BERTOLINI, et al.,

                    Defendants.

-------------------------------------------------------------X

STATE OF NEVADA           )
                            ) SS:
COUNTY OF CLARK        )

I, NICOLAS J. GAGLIARDI, being duly sworn, depose and state the following:

1.      I am the President of Plaintiff, G & G CLOSED CIRCUIT EVENTS, LLC (hereinafter "G & G"), and as such I am fully familiar with the acts, circumstances, and proceedings heretofore had herein. I have personal knowledge of each and every fact stated herein and could competently testify thereto if called as a witness.

2.      I make this affidavit in support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment.

3.      G & G is a closed circuit distributor of sports and entertainment programming. Our company purchased and retains the exclusive commercial exhibition licensing rights to the: *Saul "Canelo" Alvarez v. Daniel Jacobs WBA/WBC/IBF Middleweight Championship Fight Program,* telecast nationwide beginning on Saturday, May 4, 2019 and continuing into the morning of May 5, 2019 (hereinafter the "Program" or the "May 4-5, 2019 Program"). In addition, G & G has anti-piracy enforcement rights with respect to the Program, which apply to any unauthorized commercial broadcast in the United States, regardless of means of transmission. This Program

included the main event between Alvarez (a/k/a "Canelo") and Jacobs, as well as all undercard bouts, commentary, and related footage encompassed in the television broadcast of the event.

4.      Our company thereafter marketed the sub-licensing (commercial exhibition) rights to our company's commercial customers, and maintained enforcement protocols for all unauthorized use of the *Program*. At no time did G & G sublicense the Program to Defendants Ashleigh Bertolini, individually and d/b/a PARQ, and/or GLO 718 Corp., an unknown business entity d/b/a PARQ (hereinafter "Defendants"); moreover, as G & G purchased and retains the exclusive commercial distribution rights no other company was authorized to transmit the Program to Defendants. In other words, the Program was legally available to commercial establishments, including those in New York, only through an agreement with Plaintiff.

5.      Attached hereto as Exhibit "1" is a true and correct copy of the Master Services Agreement ("MSA") I signed on behalf of G & G with Perform Investment Limited (now known as "DAZN Limited" and referred to as "DAZN") to obtain the exclusive commercial distribution rights to the Program, as well as Statement of Work 1, incorporated therein, which applies to the May 4, 2019 Program.

6.      With the advent of pay-per-view programming, we began to experience serious erosion in the sales of our own proprietary programming to our commercial customers throughout the United States.  In response, we embarked upon a nationwide program to police our signals for the purpose of identifying and prosecuting commercial establishments that pirate our programming, including the Program that forms the subject of this lawsuit.

7.      G & G retained auditors and law enforcement personnel to detect and identify signal pirates. To ensure that only locations that illegally obtained the Program were visited by the auditors, our company compiled our confidential list of customers (authorized and legal

locations) who paid the required license fee to broadcast the Program, and this list was distributed to participating auditing and law enforcement agencies in strict confidence.

8.      The above-referenced Program include the main event bout between Alvarez (a/k/a Canelo) and Jacobs, several televised under-card bouts and color commentary, and also included pre-fight introductions and related footage of the fighters. As set forth in the affidavit of James M Emery Jr., footage of Saul "Canelo" Alvarez warming up in the ring was observed; this was part of the Program as defined herein. Neither Defendants nor PARQ lawfully licensed the Program from G & G.

9.      Domestic commercial establishments that wished to broadcast the Program were required to pay to my company a commercial sublicense fee to broadcast the Program. This sublicense fee for the Program was based on the capacity of the establishment and varies for each event. The commercial fee for an establishment the size of PARQ was $2,750. Attached hereto as Exhibit 2 is a true and correct copy of the Rate Card for this event.

10.     It is essential that I communicate to the Court that to the best of my knowledge our programming is *not* and *cannot* be mistakenly, innocently or accidentally intercepted. This is because our programming is encrypted and it is only after we authorize a commercial activation that a commercial establishment may broadcast our signal.

11.     There are several methods by which a signal pirate can unlawfully intercept and broadcast our programming - included among these are (without limitation):

   A.     The use of a "blackbox", "hotbox", or "pancake box" which is purchased for a fee and when installed on a cable TV line will allow for the descrambled reception of a pay-per-view broadcast, or

   B.     The use of a "smartcard" or "text card" or "programming card" which is purchased for a fee and when installed on a DSS satellite receiver line will allow for the descrambled reception of a pay-per-view broadcast, or

C.    The purposeful misrepresentation of a commercial establishment as a residential property to allow the fraudulent purchase of pay-per-view (or prohibited) programming at the residential rate, or, notwithstanding the existence of a commercial account, the purchase of the particular Program by a commercial establishment at a residential rate in violation of the terms of service of the business account provider.

D.    The access of programming via websites or other internet based services that are unauthorized to broadcast or distribute the programming at all or, at a minimum, unauthorized to broadcast or distribute said programming in commercial establishments; this includes DAZN, which did not have commercial distribution rights to establishments such as Defendants.

E.    The access of programming via foreign satellite broadcasters unauthorized to broadcast programming in the United States (e.g., satellite broadcasters located in Mexico but within satellite range of establishments in the southern United States).

F.    The use of illegal cable drop or splice from an apartment or home adjacent to the commercial establishment premises: (which would purchase the broadcast at a residential price and divert the program to the commercial establishment), and/or

G.    The purchase of other illegal unencryption devices, and the purchase of illegal satellite authorization codes which are readily available on the internet, in trade publications, and through "word of mouth."

12.    By way of information, I wish to explain to the Court how the encryption process works. In the parlance of the industry, my company is known as a "closed-circuit distributor." This term dates back to the days when sporting events were exhibited to viewers at venues (i.e., theaters, armories, banquet halls, auditoriums) that were leased and the television broadcast signal of the event being exhibited at these venues was transmitted on a closed-circuit basis. In order to safeguard against the unauthorized interception or receipt of the Program, the interstate satellite transmission of the Program was electronically coded or scrambled and was not available to or intended for the use of the general public.

13.    Today, the programs, including the Program at issue herein, originate via satellite uplink and are subsequently re-transmitted to cable systems and satellite systems via satellite

signal. If a commercial establishment is authorized by Plaintiff to receive the Program, the establishment is provided with the electronic decoding equipment and the satellite coordinates necessary to receive the signal, or the establishment's programming provider is notified to unscramble the reception of the Program for the establishment, depending upon the establish

14.     As noted above, with respect to the satellite nature of the telecast, the Program originated via satellite uplink. In this case, as provided in the MSA between G & G and DAZN, the Program originated via satellite uplink through Strategic. Strategic had production trucks on-site where the event took place (Las Vegas, Nevada), and Strategic transmitted the live feed from the venue to satellites.

15.     I am personally aware of the methods of transmission of all events for which G & G contracts, including the Program at issue herein. I have been President of G & G since March 1, 2013; in this position, I am responsible for ensuring G & G's profitability, and, therefore, must protect its licensed programming from illegal interception, publication, and receipt. I could not properly function in this role without having a complete understanding of precisely where and how the programming originates, and how it is legally, and illegally, transmitted and received.

16.     I also obtain this information, at least in part, from the negotiations I have with promoters – in this instance, DAZN - when crafting the MSAs at issue. For example, the MSA for the May 4-5, 2019 Program contains a specific provision (MSA, § 6.a) which identifies the possible original methods of signal origination. As noted above, for this specific Program, the Program originated via satellite uplink through Strategic, as expressly provided in MSA, § 6.a.

17.     On the nights of events, I am kept fully apprised of all issues related to the broadcasts, including any issues related to the original transmission from the event site, and whether there may have been any technological issues that necessitated a modification of the

method of transmission. There were no modifications with respect to the May 4-5, 2019 Program; the May 4-5, 2019 Program originated via satellite uplink through Strategic as planned.

18.     In addition to serving as President of G & G, I have held the position of Vice-President of J & J Sports Productions, Inc. I held this position from March 1, 2013, to December 31, 2016. J & J Sports Productions, Inc. was another closed circuit distributor of sports and entertainment programing. Through my role with J & J Sports Productions, Inc., I also obtained knowledge of all aspects of broadcasts, including signal origination and transmission.

19.     For commercial establishments, the Program was lawfully available through various methods. Regardless of the medium, however, prior authorization from G & G was required before a commercial establishment could broadcast the Program lawfully.

20.     PARQ had no justification to steal our programming and exhibit it for its own financial benefit, and its actions denied our company of the commercial license fee to which it was rightfully entitled.

Nicolas J. Gagliardi, President
G & G Closed Circuit Events, LLC

Sworn to before me on this 20th day
of December , 2022

NOTARY PUBLIC

Notary Public - State Of Nevada
COUNTY OF CLARK
ELAINE LOPEZ
My Appointment Expires
April 28, 2026
No: 22-2729-01

6

# EXHIBIT

# 1

# PERFORM INVESTMENT LIMITED

## MASTER SERVICES AGREEMENT

This Master Services Agreement (the "Agreement" or "MSA") is entered into as of the 1st day of May 2019 ("**Effective Date**") by and between Perform Investment Limited a company incorporated and existing under the laws of England and Wales with company number 09676399, whose registered office is at Hanover House, Plane Tree Crescent, Feltham TW13 7BZ, England ("**DAZN**" or "**Promoter**") and G&G Closed Circuit Events, LLC a company incorporated and existing under the laws of Nevada whose registered office is at 2925 Green Valley Parkway, Suite D, Henderson, Nevada 89014 ("**G&G**" or "**Licensee**"), under which Licensee will distribute certain media rights as described below on the terms and conditions herein.

In consideration of the mutual covenants herein contained, the sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.    **Grant of Right**. DAZN hereby grants Licensee the exclusive right to sublicense certain DAZN events ("individually described as an "**Event**", or collectively described as the "**Events**", as the case may be") specified in Exhibit A and B [Statement of Work 1 and 2 "**SOW 1, 2**"] as well as Events described within any future applicable SOWs, if any, to Commercial Premises (as described below) within the United States of America and Puerto Rico ("**Territory**"). For the purposes of this Agreement, "**Commercial Premises**" means non-residential locations, including, but not limited to, bars, clubs, pubs, lounges, social clubs, event halls, and restaurants of a commercial or non-commercial nature, each with a fire code occupancy capacity not to exceed                          (except for outlets within certain casinos where the seating capacity may exceed                          located within the Territory, except establishments identified on any "**Black Spot List**", as provided by DAZN for each SOW. For the avoidance of doubt, Commercial Premises shall exclude hotel guest rooms, theaters, arenas, racetracks, in-flight aircraft or other transportation facilities.

2.    **Reserved Rights**. Any and all rights not expressly granted to Licensee under this Agreement are reserved by DAZN which shall include, but not be limited to, any form of betting, data, private and public viewings (other than viewing by individuals in Commercial Premises in the Territory which are primarily indoors; this would include a bar with an outdoor terrace, but exclude a public screening in a park, stadium, street, or fan zone, for example), transportation and archive rights, and as additionally provided by DAZN for each SOW. Licensee acknowledges and agrees that DAZN may at its discretion either exercise any such rights itself or authorize any third party to exercise any such rights, whether in the Territory or otherwise. Licensee acknowledges and agrees that this shall include the right for DAZN or third parties authorized by DAZN to produce and transmit Events for viewing for promotional, marketing, sponsorship, partnership, scouting, training, analysis and/or similar purposes.

3.    **License Fee.** As full and complete compensation for the rights granted to Licensee by Promoter, Licensee shall pay to Promoter the license fee calculated as follows:

    a.  Licensee shall pay the Minimum Guarantee on a per Event basis per the terms in applicable SOW and pursuant to the provisions of Paragraph 4 of this Agreement;

    b.  Then, the amount of all gross revenues in excess of the Minimum Guarantee (as defined below) (which threshold amount Licensee shall retain in recoupment of the Minimum Guarantee) which Licensee receives from all closed circuit television exhibitions of the Events in the Territory shall be payable as follows:

    c.  In the event that Licensee should sublicense a Commercial Premise for a fixed lump sum or for a license fee which includes a guaranteed amount which is not exceeded by Licensee's share of revenues from that Commercial Premise, Licensee shall include in gross revenue hereunder the amount equal to such lump sum or guarantee.

    d.  Licensee covenants to Promoter that Licensee will use best efforts to support and service Licensee's sublicensees or Outlets (as defined in Exhibit B) in advance of, during, and subsequent to the broadcasts of the Events referenced on the Statement of Work 1 (Exhibit A) of this Agreement and any future applicable SOWs by providing sufficient staff, telephone, or other resources necessary to address any inquiries or issues that may arise concerning sublicensing of the Events, receipt of signal to the Events, payment of sublicense fees regarding the Events, receipt and use of marketing materials related to the Events and related issues or matters that may arise requiring the input, attention, and involvement of the Licensee to respond and assist the sublicensees and Outlets exhibiting the Events or seeking to do so.

    e.  Credit Card expenses incurred by the Licensee for payment processing of license fees from establishments and approved in advance by DAZN shall be applied against the license fee revenues and "taken off the top" prior to any revenue share between the parties and will be capped at       of gross revenues. Licensee may deduct up to      of gross for advertising materials, including publicity, marketing collateral printing and shipping expenses on an event by event basis. All such advertising materials shall be subject to Promoter's prior written approval. Licensee will only deduct actual and verifiable costs and deliver line item reports for such costs and DAZN will have the right to audit such expenses on a per Event basis. Such expenses will not include any commissions or distribution fees to third party sales agents or distributors.

    f.  DAZN shall set and approve all pricing and rate cards for each Event in an applicable SOW. Licensee may negotiate volume discounts and charge above the rate card within       but shall not discount below the rate card without DAZN's prior written approval via email.

g.    DAZN shall have the right to engage in discussions and direct negotiations with establishments identified on "Black Spot" list for each applicable SOW, where revenues obtained through such establishments shall be accounted for in the Minimum Guarantee from the Licensee to DAZN.

4.    **Minimum Guarantee.**

a.    Licensee shall pay Promoter a minimum guarantee and non-refundable advance against the License Fee pursuant to Paragraph 3 of this Agreement as described in each applicable SOW ("**Minimum Guarantee**") not later than one (1) business day prior to each applicable Event; and

b.    The Minimum Guarantee amount shall be paid by:

i.    a certified check or bank cashier's check payable to "Perform Investment Limited" in such amount; or

c.    Payment of all license fee amounts in excess of the applicable Minimum Guarantee for under each SOW shall be due and payable to Promoter not later than thirty (30) business days after the Event.

5.    **Equipment & Signal Transmission of the Telecast of Events.** Licensee and Licensee's sublicensees shall be responsible to obtain, at Licensee's or their cost and expenses, either:

a.    Authorization to receive the telecast of the Events through the services of one or more satellite ("DDS") programming providers such as DirecTv or DISH Network, to be selected by Licensee and approved by Promoter in writing in advance; or

b.    Authorization to receive the telecast of the Events through the services of one or more cable programming providers to be selected by Licensee and approved by Promoter in writing in advance; or

c.    Authorization to receive the telecast of the Events through the services of one or more alternate programming providers (such as streaming sites), to be selected by Licensee and approved by Promoter.

3

d.    Licensee shall not charge activation or signal transmission fees to Licensee's sublicensees in excess of such fees charged to Licensee by any programming providers delivering signal transmission of the Telecast of the Events. Any equipment charges necessary to Licensee's sublicensees to receive the Events shall be at Licensee's cost and/or the cost of Licensee's sublicensees.

6.    **Delivery of Signal**

a.    Promoter shall deliver either, as Promoter shall elect in its discretion, (i) the encrypted transmission of the video and audio signal of its telecast of the Events to a domestic satellite or other delivery point from which the signal is capable of being received by Strategic, DSS and/or VUBIQUITY, for redistribution to Licensee's designated outlets or (ii) by fiber optic cable to a delivery point at which the signal is capable of being received by DSS and VUBIQUITY, for redistribution to Licensee's designated outlets. Such delivery to the delivery point shall constitute full and complete discharge of the obligations of Promoter to Licensee hereunder. Strategic, DSS and/or VUBIQUITY, if applicable, as the case may be, shall have the responsibility to address and authorize decoders or any other such equipment for Licensee's authorized sublicensees. Licensee shall be responsible for all charges for addressing and authorizing Licensee's sublicensees, as well as all costs and expenses necessary for the reception of the signal and for the projection at the outlets.

b.    Promoter shall have no responsibility for Licensee's signal transmission, equipment, decoder and/or authorization fees, and Promoter shall have no responsibility or liability to Licensee or Licensee's sublicensees for any technical failures which may occur in connection with the authorizing of equipment or decoders for Licensee's sublicensed closed circuit exhibition outlets or in connection with any retransmission or authorizing by Strategic, DSS and/or VUBIQUITY, and in such case, Licensee remain responsible for payment of the License Fee to Promoter.

c.    Licensee shall instruct Strategic, DSS and/or VUBIQUITY, if applicable, to provide directly to Promoter, on the first business day after the Events, their complete final sublicense reports which shall indicate the name, address, and city of each sublicensed outlet and the decoder number for each sublicensed outlet.

7.    **Online Internet Transmissions**

Licensee acknowledges the Promoter will (or may) be licensing the live and delayed cable television, direct broadcast satellite television and digital online internet transmission and exhibitions of the Events in the Territory to residential locations for DAZN customers; except for Anti-Piracy Enforcement as specified below, Licensee shall have no interest or participation in such exhibitions or any other exploitation of the Events. Accordingly, Licensee has no right to record, duplicate or copy the Events by any means or to exhibit, reproduce or retransmit the Events or any portion thereof.

4

8.   **Anti-Piracy Enforcement**

Licensee and Licensee's sublicensees shall use their best efforts to employ adequate security systems and other measures to prevent theft, pirating, copying, duplication or unauthorized exhibition or transmission of the Events. Licensee shall promptly advise the Promoter of any piracy (i.e., unauthorized use or proposed use) of the Events in the Territory.

a) Notwithstanding the fact that Licensee has secured the rights from Promoter to sublicense live DAZN telecasts of the Events at Commercial Premises within the Territory under this Agreement and applicable SOWs, Licensee shall have the right to identify and thereafter prosecute any and all acts of alleged piracy of the Events, regardless of the means of transmission (i.e., international broadcasts, internet streaming, replay on private media, etc.) and regardless of whether the Events are exhibited in real-time or on a delayed-broadcast basis against the operators, permittees, officers, members, and other persons (both individuals and entities) with interests, involvement, and/or affiliation with the Commercial Premises within the Territory identified exhibiting the Events in an unauthorized manner. Licensee's right to prosecute piracy regarding unauthorized exhibition of the Events shall be limited exclusively to claims against operators, permittees, officers, members, and other persons (both individuals and entities) with interests, involvement, and/or affiliation with the Commercial Premises within the Territory only, and shall be subject to Reserved Rights and any other exclusions subsequently agreed upon by Promoter and Licensee and thereafter memorialized in an applicable SOW.

b) Licensee shall provide Promoter advanced, written notice of potential suit filings prior to commencing litigation in the Territory. Subject to Promoter's written consent which shall not be unreasonably withheld, Licensee shall be afforded all necessary remedies at law or equity to protect Promoter and Licensee in the prosecution of piracy and infringement claims involving the Events, including instituting suit under the federal telecommunication statutes (i.e., Titles 47 U.S.C. §553 and §605), state statutes, common law causes of action that may be applicable, claims and copyright (i.e., Title 17 U.S.C. §101). Notwithstanding Licensee's exclusive right to prosecute piracy claims involving the Commercial Premises within the Territory, all such litigation will be conducted on terms mutually agreeable between the Promoter and Licensee.

c) Licensee is the sole and exclusive agent and representative with respect to grant, lease, sale, use or other exploitation of reproduction rights to Events for purposes of performance and transmission of the of the Events in Commercial Premises in the Territory, as described within this Agreement and any applicable SOW. Licensee shall be the exclusive owner of the copyright for the Events for the purposes of performance and transmission of the Events in Commercial Premises in the Territory from the Effective Date. Licensee has all right, title and interest in any accrued or later accrued claims, causes of action, or lawsuits brought to enforce copyrights in the Events, appointing and permitting Licensee to prosecute said accrued or later accrued claims as if it were DAZN. DAZN shall not grant the exclusive ownership of the copyright for the Events for the purposes of performance and transmission of the Events in Commercial Premises from the Effective Date herein granted to Licensee to any other party.

d) Upon expiration or termination of this Agreement, all rights licensed or otherwise transferred to Licensee hereunder, including copyright, shall cease and revert to DAZN, and Licensee agrees to execute all instruments necessary and desirable to revert said rights in DAZN.

e) In case Licensee should enforce copyright or piracy rights based on infringement of Licensee's rights granted under this Agreement, then Licensee shall always take legal actions only in Licensee's name and not DAZN's name.

f) Any damages, whether statutory, compensatory, punitive or otherwise, which Licensee may recover from the theft, piracy, copying, duplication, unauthorized exhibition or transmission of the Events in the Territory, and after payment of costs, expenses, and attorneys' fees, shall constitute gross revenues from the Events, to be shared by, and distributed to, the Promoter and Licensee as provided in Paragraph 3 of this Agreement. Licensee shall advance all required costs, expenses, and attorneys' fees necessary for anti-piracy enforcement under this Paragraph, subject to recoupment from any application recovery, and shall report all expenses, settlements and recoveries to Promoter on a quarterly basis. Licensee's sublicensees shall have no right to commence or settle any claim or litigation arising out of the alleged piracy of the telecast hereunder without the prior written consent of Promoter.

9.    **Attachments.**    Annexed to this Agreement as exhibits are the following documents, the terms and conditions of which are incorporated herein as if set forth in their entirety:

a.    Exhibit A: Statement of Work 1 ("SOW 1"), which shall apply to this Agreement, is deemed to incorporate by reference any and all terms and conditions of this Agreement.

b.    Exhibit B: Statement of Work 2 ("SOW 2"), which shall apply to this Agreement, is deemed to incorporate by reference any and all terms and conditions of this Agreement

c.    Exhibit C: Standard Terms and Conditions which shall apply to this Agreement.

10.    **Term and Termination.**    The term of this Agreement shall be for the period commencing on the Effective Date and ending December 31, 2019 (the "**Term**"), unless extended in writing by mutual agreement of the parties.

11.    **Defaults.**

a.    Licensee's failure to deliver the Minimum Guarantee as provided in Paragraph 4 hereof or to pay the license fee as provided in Paragraph 3 hereof or to pay the signal delivery fees or equipment expenses as provided in Paragraph 5 hereof or to comply with any other term or condition of this Agreement or of an applicable SOW, the annexed agreements or Standard Terms and Conditions shall permit Promoter, in addition to all of its other rights and remedies: (i) to cancel this Agreement with Licensee at any time without any further liability or obligation to Licensee and (ii) to retain all monies paid to Promoter prior to such cancellation. Provided, however, that before Promoter may exercise any remedy with respect to any such default, Promoter

must (i) provide Licensee with written notice specifying such default, and (ii) if and to the extent that time reasonably permits prior to the Event, provide Licensee with up to seven (7) days after Licensee's receipt of such default notice within which to cure such default.

        b.     If, in violation of the provisions of this Agreement, Licensee or a sublicensee exhibits the Event in an outlet with a fire code occupancy limit in excess of 500 persons (except casino locations), then, in addition to the license fee for such outlet as provided in Paragraph 3, and in addition to and not in limitation of or in lieu of any other rights or remedies Promoter may have under this Agreement, at law or in equity, including, without limitation, Promoter's rights to indemnification hereunder, Licensee shall immediately pay to Promoter an amount equal to the following for each such outlet that violates the aforesaid restriction: the sum of the fire code occupancy capacity of the outlet multiplied by 50% of the face amount of the highest ticket or admission price for the Event at that outlet, Licensee agree that this payment is reasonably calculated to reimburse Promoter for its damages in the event of such violation of this Agreement.

        12.   **Reports, Collection and Accounting.**

        a.     Licensee shall be responsible for collection of all monies from sublicensees shall make all payments and provide all reports pursuant to Paragraph 4 of the Standard Terms and Conditions (Exhibit B). Licensee shall distribute to Promoter all amounts due for exhibition rights to the Event, with no deduction, set-offs or holdbacks whatsoever.

        b.     In addition to the reports required in the Standard Terms and Conditions, for each Event, Licensee shall, within twenty (20) business days of the Event, provide DAZN with a written report setting out:
         i.     a list of all participating Commercial Premise that licensed the Event;
         ii.    method of signal delivery to each participating Commercial Premise; and
         iii.   sublicensee fees that Licensee received from each Commercial Premises and any outstanding fees;
         iv.   report identifying expenses and revenue split above Minimum Guarantee;
         v.    the list of all commercial premises that displayed the Events without obtaining a sublicense.
        c.     DAZN shall be granted audit rights in connection with review of all records related to each Event.
        d.     Promoter's representatives shall have the right to visit Licensee's offices and each Commercial Premise at any time prior to the Event and after the Event to obtain and verify information, in person or electronically, and to make arrangements for the payment of all license fees due to Promoter promptly following the Event.

        13.   **Indemnification.** Licensee and DAZN shall each indemnify and hold the other, the other's parent and affiliated companies, and their respective officers, directors, employees and agents harmless from any and all claims, costs, liabilities, judgments, expenses or damages (including reasonable attorneys' fees) either party may incur, due to any negligent or wrongful acts or omissions, including but not limited to breach of this Agreement, of the indemnifying party, its agents or employees, in the performance of its obligations hereunder.  In any case in which

indemnification is sought hereunder the party requesting indemnification shall promptly notify the other of any claim for litigation to which the indemnification relates, and the party requesting indemnification shall afford such party the opportunity to participate in and at such party's option, fully control any compromise, settlement, litigation or other resolution or disposition in such claim or litigation. The provisions of this Paragraph shall survive the termination and/or expiration of the Agreement.

14.   **Notices.** All contracts and reports shall be sent to:

If to DAZN:

>   Perform Investment Limited
>   1 World Trade Center, 72nd Floor
>   New York, NY 10007
>   Attn: Tom Constabile, VP Business Development
>   Tom.Constabile@dazn.com

>   With a copy to: Sunjay Mathews, Head of Legal, North America
>   Sunjay.Mathews@dazn.com

If to G&G:

>   Nicolas J. Gagliardi
>   G & G Closed Circuit Events, LLC
>   2925 Green Valley Parkway, Suite D
>   Henderson, NV 89014
>   nick@ggccevents.com

>   With a copy to: Thomas P. Riley, Esquire
>   tprlaw@att.net

15.   **Confidentiality.** Neither party shall disclose to any third party (other than its employees and agents, in their capacity as such, on a need-to-know basis), any information with respect to the terms and provisions of this Agreement except: (i) to the extent necessary to comply with law or the valid order of a court of competent jurisdiction, in which event the party seeking disclosure shall so notify the other party as promptly as practicable (if possible, prior to making such a disclosure), (ii) as part of normal reporting or review procedure to its banks, auditors and attorneys and similar professionals, provided that such banks, auditors, attorneys and similar professionals agree to be bound by the provisions of this paragraph, and (iii) in order to enforce its rights pursuant to this Agreement.

16.   **Entire Agreement.** This Agreement supersedes and terminates all prior agreements between the parties hereto and their affiliates with respect to the subject matter contained herein, and this Agreement embodies the entire understanding between the parties relating to such subject matter, and any and all prior correspondence, conversations and memoranda are merged herein and shall be without effect hereon. It may not be altered, amended

8

or discharged, except by a subsequent writing signed by the parties hereto. The laws of the State of New York applicable to contracts executed and to be fully performed in the State of New York shall govern this agreement, and execution of the agreement shall constitute the consent of Licensee and any sublicensee to exclusive jurisdiction of New York. Any dispute, controversy or claim arising out of or relating to this Agreement, including the formation, interpretation, breach or termination thereof, including whether the claims asserted are arbitrable, will be referred to and finally determined by arbitration in accordance with the JAMS Commercial Arbitration Rules before a single arbitrator who shall be selected by the parties to the arbitration and who shall be a retired judge or justice. If the parties are unable to select an arbitrator, the arbitrator will be selected in accordance with the JAMS Rules. The place of arbitration will be New York, New York. Judgment upon the award rendered by the arbitrator(s) may be entitled to its reasonable costs, including the costs of arbitration, and attorneys' fees. The prevailing party in arbitration shall be entitled to its reasonable costs, including the costs of arbitration and attorneys' fees.

IN WITNESS WHEREOF, the undersigned have caused this Master Services Agreement to be duly entered into as of the Effective Date.

G&G CLOSED CIRCUIT EVENTS, LLC

By:_____
Name: Nicolas J. Gagliardi
Title:  President

PERFORM INVESTMENT LIMITED

By:_____
Name:  Paul Morton
Title:  EVP, Finance

BY SIGNING THIS AGREEMENT, LICENSEE ACKNOWLEDGES HAVING READ THE ATTACHED STANDARD TERMS AND CONDITIONS AND CONFIRMS ITS AGREEMENT THERETO. NO CHANGES ARE AUTHORIZED IN THE ATTACHED TERMS AND CONDITIONS UNLESS AUTHORIZED BY PROMOTER.

9

## Exhibit A

### Statement of Work 1 ("SOW 1")
### Between
### Perform Investment Limited and G&G Closed Circuit Events, LLC
### Effective Date: May 1, 2019

Pursuant to that certain Master Services Agreement (the "MSA") with an effective date of May 1, 2019, by and between the parties thereto, this SOW is entered into by and between Perform Investment Limited a company incorporated and existing under the laws of England and Wales with company number 09676399, whose registered office is at Hanover House, Plane Tree Crescent, Feltham TW13 7BZ, England ("**DAZN**" or "**Promoter**"), and G&G Closed Circuit Events, LLC a company incorporated and existing under the laws of Nevada whose registered office is at 2925 Green Valley Parkway, Suite D, Henderson, Nevada 89014 ("**G&G**" or "**Licensee**") ("**G&G**" or "**Licensee**") for the provision of the services and/or goods as described below. This SOW shall become effective and enforceable upon signature of both parties.

This SOW 1 is deemed to incorporate by reference any and all terms and conditions of the MSA. If there is any inconsistency or contradiction between the MSA and the SOW, the terms of this SOW shall prevail.

### 1.  Event 1
Event 1 is the Saul Alvarez vs. Daniel Jacobs boxing match, scheduled 12 round WBA, WBC IBF Middleweight Championship Bout, including selected undercard bouts (**Fighters are subject to change**).
Venue: T-Mobile Arena, Las Vegas, NV.
Event Date: Saturday, May 4th, 2019.

**Minimum Guarantee**: Pursuant to Paragraphs 3 and 4 of the MSA, Licensee shall pay Promoter ⟨ ⟩ not later than one (1) business day prior to Event 1 (prior to May 4, 2019).

**First profit window to G&G:** Pursuant to the MSA, the first ⟨ ⟩ in gross revenue in excess to the Minimum Guarantee shall be retained by G&G.

**Revenue Share:** Pursuant to the MSA, the remaining balance of gross revenue shall be split ⟨ ⟩ to DAZN and ⟨ ⟩ to G&G.

### Rate Card for Event 1:

| Capacity | Pricing |
| --- | --- |
| 1 to 50 | $875 |
| 51 to 100 | $1250 |
| 101 to 200 | $2,500 |
| 201 to 300 | $3,750 |

10

| 301 to 400 | $5,000 |
| 401 to 500 | $6,250 |

- Rate based on $12.50 per head
- Activation Fee of $250 needs to be added to pricing
- Cable Clients: Provider will bill Activation Fees directly

**Reserved rights:**
- theaters;
- arenas;
- racetracks;
- hotel rooms;
- transportation;
- casinos in Las Vegas.

**Black Spot List for Event 1**: None.

11

**Exhibit B**

**Statement of Work ("SOW 2")**
**Between**
**Perform Investment Limited and G&G Closed Circuit Events, LLC**
**Effective Date: May 30, 2019**

Pursuant to that certain Master Services Agreement (the "MSA") with an effective date of May 1, 2019, by and between the parties thereto, this SOW is entered into by and between Perform Investment Limited a company incorporated and existing under the laws of England and Wales with company number 09676399, whose registered office is at Hanover House, Plane Tree Crescent, Feltham TW13 7BZ, England ("**DAZN**" or "**Promoter**"), and G&G Closed Circuit Events, LLC a company incorporated and existing under the laws of Nevada whose registered office is at 2925 Green Valley Parkway, Suite D, Henderson, Nevada 89014 ("**G&G**" or "**Licensee**") ("**G&G**" or "**Licensee**") for the provision of the services and/or goods as described below. This SOW shall become effective and enforceable upon signature of both parties.

This SOW 2 is deemed to incorporate by reference any and all terms and conditions of the MSA. If there is any inconsistency or contradiction between the MSA and the SOW, the terms of this SOW shall prevail.

2.  **Events 2 & 3**

Event 2 is the Anthony Joshua vs. Andy Ruiz, Jr. boxing match, scheduled 12 round WBA, WBO, IBF Heavyweight Championship Bout, including selected undercard bouts (**Fighters are subject to change**).
Event 2 Venue: Madison Square Garden, New York, NY.
Event 2 Date: Saturday, June 1st, 2019.

Event 3 is the Gennady Golovkin vs. Steve Rolls boxing match, scheduled 12 round bout, including selected undercard bouts (**Fighters are subject to change**).
Event 3 Venue: Madison Square Garden, New York, NY.
Event 3 Date: Saturday, June 8th, 2019.

**Minimum Guarantee**: Pursuant to Paragraphs 3 and 4 of the MSA, Licensee shall pay Promoter                                                  not later than one (1) business day prior to Event 3 (prior to June 7, 2019).

**First profit window to G&G:** Pursuant to the MSA, the first                      in gross revenue in excess to the Minimum Guarantee shall be retained by G&G.

**Revenue Share:** Pursuant to the MSA, the remaining balance of gross revenue shall be split                to DAZN and          to G&G.

12

**Rate Card for Event 2:**

| Capacity | Pricing |
|---|---|
| 1 to 50 | $400 |
| 51 to 100 | $800 |
| 101 to 200 | $1,600 |
| 201 to 300 | $2,400 |
| 301 to 400 | $3,200 |
| 401 to 500 | $4,000 |

**Rate Card for Event 3:**

| Capacity | Pricing |
|---|---|
| 1 to 50 | $300 |
| 51 to 100 | $600 |
| 101 to 200 | $1,200 |
| 201 to 300 | $1,800 |
| 301 to 400 | $2,400 |
| 401 to 500 | $3,000 |

**Rate Card for Combination Event 2 & 3:**

| Capacity | Pricing |
|---|---|
| 1 to 50 | $1,000 |
| 51 to 100 | $1,600 |
| 101 to 200 | $2,800 |
| 201 to 300 | $4,000 |
| 301 to 400 | $5,200 |
| 401 to 500 | $6,400 |

- Activation Fee of $250 needs to be added to pricing
- Cable Clients: Provider will bill Activation Fee directly.
- Texas locations must add 3% State tax
- Casinos $15 per head, a minimum of 300 persons for $4,500

**Black Spot List for Events 2 & 3:**
Black Spot List to be discussed and mutually agreed on prior to the Event.

**Exhibit C**

**STANDARD TERMS & CONDITIONS**

Perform Investment Limited, d/b/a DAZN ("**Promoter**") has agreed to grant G&G Closed Circuit Events, LLC ("**Licensee**") pursuant to the Master Services Agreement (the "Agreement" or "**MSA**") to which these Standard Terms & Conditions are annexed certain rights to exhibit and license others to the Promoter's scheduled telecast of the Events pursuant to each SOW.

The Events shall be promoted by Promoter.

The provisions of these Standard Terms & Conditions shall apply to both Licensee and authorized sublicensees as appropriate, and to the extent they are applicable, the terms of these Standard Terms & Conditions shall be incorporated by reference into all Licensee's sublicense agreements for the Event.

THE RECEPTION AND EXHIBITIONS OF THE TELECAST OF THE EVENTS BY LICENSEE OR ANY PERMITTED SUBLICENSEES SHALL BE SUBJECT TO THE FOLLOWING TERMS & CONDITIONS:

1.   Limited Rights
     (a)       With the exception of the Anti-Piracy Enforcement provisions set forth in Paragraph 8 of the MSA, which specifically allows Licensee the right to prosecute claims of unauthorized exhibition of the Events by the operators of the Commercial Premises that obtain signal or transmission of the Events on a delayed basis (i.e., international feeds, replay, private media, etc.) all other rights and licenses herein granted to Licensee are solely for the live exhibitions simultaneous with the Events, as provided in the MSA
     **(b)     The term "Closed Circuit Basis" shall mean exhibition of the Events at any non-residential locations not specifically excluded in the MSA or an applicable SOW (the "Outlets") located within the Territory sublicensed by Licensee.**
     (c)       This license does not grant Licensee or any sublicensee the right to record, duplicate or copy the Events by means whatsoever, or to exhibit, authorize or permit the recording, reproduction or retransmission of the Events or any portion thereof.
           (i)    Licensee may sublicense the exhibition of the Events, pursuant to the terms and conditions of the Master Services Agreement and these Standard Terms and Conditions. .
           (ii)   Licensee or any sublicensee shall not have or exercise any rights whatsoever with respect to the Events other than those specifically licensed to it; and in no event shall sublicensee have the right to further sublicense any exhibition or other right to the Events. Upon any material breach of this Paragraph 1, Promoter shall have all of its rights and remedies at law and equity, including, without limitation, the right to enjoin any exhibition or exploitation of the Events; suspend the transmission of the Events to Licensee or any sublicensee; terminate this license and/declare the Master Services Agreement and these Standard Terms and Conditions breached, declare all amounts payable hereunder, retain all monies paid to Promoter prior to the breach, and exercise all rights and remedies on account of such breach, including, without limitation, the right to recover damages caused to Promoter in connection with such breach.

14

(d)     Licensee and any sublicensees shall use their best efforts to employ adequate security systems and other measures to prevent theft, pirating, copying, duplication or unauthorized exhibition or transmission of the Events.

2.     Delivery of Signal.

(a)     Promoter shall be responsible for the delivery of the broadcast quality video and audio signal of the telecast of the Events in their entirety to communications satellites or other transmission facilities (to be selected by Promoter). Such communications satellites or other transmission facilities shall constitute full and complete discharge of the obligations of Promoter to Licensee hereunder. The signal shall be delivered in compressed format, utilizing PGCA conditional access technology or the current equivalent.

(b)     Licensee or its sublicensees shall be responsible to ensure delivery of the video and audio signal from the Delivery Point to the receiving device outlets, and each sublicensee shall be responsible for reception of the signal and for projection at their Outlets.

(c)     If the Event is not transmitted to the Delivery Point for any reason beyond the reasonable control of Promoter, Promoter shall not be in breach of these Standard Terms & Conditions. Promoter shall also not have any responsibility for any failure of the live transmission resulting from inclement weather, failure of the satellite, or failure of any services or equipment, as Licensee shall insure against all such occurrences at its own expense as provided below. If the Event is rescheduled to a date other than the telecast date in accordance with the provisions of Paragraph 14 below, and is telecast by Promoter on said rescheduled date, then the telecast shall not be deemed to have completely or partially omitted.

(d)     If any omission or impairment of the telecast for any of the aforesaid reasons in partial, or is for any reason caused at the production point, transmission point of delivery point or Delivery Point, or at an Outlet, or between the production point and an Outlet, including but not limited to said facilities and any reception, encoding, decoding, projection or transmission services and equipment, Licensee shall nevertheless report and make payments to Promoter as required without regard to any allowances, adjustments or refunds given by Licensee.

(e)     If the event is not transmitted to the Delivery Point for any reason beyond the reasonable control Promoter, or if any omission or impairment of the telecast for any of the aforesaid reasons is partial, or is for any reason caused at the production point and an Outlet, or between the production point and an Outlet, including but not limited to said facilities and any reception, encoding, decoding, projection or transmission services and equipment, sublicensee shall hold Promoter and Licensee harmless from any and all damages, expenses and costs, and sublicensee's sole and exclusive remedy is a reimbursement of its licensing fee.

3.  Telecast Facilities and Technical Services.

(a)     Licensee and each sublicense shall obtain and provide at their cost and expense a television satellite reception facility or other signal reception or connection facility acceptable to Promoter, for each Outlet and signal decoder if required (herein referred collectively as ("such facilities") necessary to receive and decode the video and audio signal of the telecast from the Delivery Point to the Outlet, as provided in the Master Services Agreement. Promoter shall not have any ability by reason or delay, damage or failure of the entity from which such facilities are ordered to furnish the same, nor by reason of the unavailability or any failure of such facilities.

15

(b)     As applicable, Licensee and each sublicensee shall provide, and Licensee shall arrange for authorization of the compatible decoding equipment or authorization as provided in the MSA.

(i)     Promoter has not made representation, warranty or covenant, express or implied, with respect to the delivery, installation, merchantability, fitness, condition, quality, durability, suitability or compatibility of the decoding equipment for any purposes, or any other representation, warranty or covenant, express or implied, with respect to the decoding equipment or such facilities or any part thereof; and Licensee and sublicensee release Promoter from any and all liability with respect thereto and for any malfunction or failure of the equipment to operate as may be represented by the manufacturer of the equipment.

(c)     It shall be further obligation of Licensee and each sublicensee to obtain and provide at their sole cost and expense everything else, including, but not limited to, materials and personnel of any necessary for the reception, projection, exhibition, and presentation of the telecast for transmission before paying audiences at the Outlets and for Installation testing and operation of the equipment.

4.     License Fee Reports, Verification

(a)     In consideration for the rights herein granted to Licensee, Licensee shall pay to Promoter the license fee set forth in Paragraphs 3 & 4 of the Master Services Agreement. All license fees due Promoter (in excess of any Minimum Guarantee) shall be remitted not later than twenty (20) business day after the Events.

(b)     Promoter and authorized representatives shall have the right at any time before, during and after the telecast of the Events, to enter the Outlets and inspect the conduct of the telecast therein, the systems and procedures for box office sales and collections and to inspect, audit and make excerpts from the books and records of Licensee at the Licensee's offices, and at the offices of sublicensees, at any time during business hours, relating to the telecast, in person or electronically (each an "Audit"). In the event that such Audit reveals a deficiency between the amount due to Promoter and the amount actually paid by Licensee, within thirty (30) days of Licensee's receipt of written of any such deficiency, Licensee shall pay the amount of the deficiency together with interest thereon at a rate per annum of five (5%) from the date such payment was originally due until the date of actual payment. Should any such Audit establish a deficiency of three percent (3%) or more, in addition to paying the amount of the deficiency together with interest thereon, Licensee shall pay for the costs of such Audit. For this purpose Licensee and each sublicensee shall keep full and complete books and records of all tickets sales and gross receipts at each Outlet, or the lump sums or guaranteed minimum payment from each sublicensee, and shall maintain such books and records for the period of three (3) years after the Event. Promoter and its authorized representatives shall likewise have the right to receive from Licensee by personal delivery on and after the times specified in subparagraphs (b) (i) and (ii), copies of each of the respective reports Licensee and each sublicensee is required to send Promoter pursuant to said subparagraphs and to examine, and make copies of, the books and records of Licensee and each sublicensee relating to gross revenues from the Event.

(c)     Any damages, whether statutory, compensatory, punitive or otherwise, which Licensee may recover from the theft, piracy, copying, duplication, unauthorized exhibition or transmission of the Event in the Territory after payment of costs, expenses, and attorneys' fees, shall be included in the license fees payable to Promoter hereunder. That is, Licensee shall pay to

Promoter a percentage of such net recovered damages equal to the percentage that would have been payable to Promoter if such damages had been receipts of sublicensing revenue from Outlets in the Territory.

5.      Telecast: Sponsorship

The Telecast of the Events will contain commentary relating to the Event, between rounds and between bouts, so that the telecast will consist of continuous programming of network quality. Promoter reserves the right to license the display of commercial material on the ring mat, ring post corner pads, and clothing and equipment of the participants and to include commercial and promotional spots, announcements and material in the telecast, including with respect to such sponsors as Promoter may select without regard to any competing sponsorship arrangements of Licensee or any sublicensee.

6.      Covenants, Representations and Warranties

(a)      By Promoter:

(i)      Promoter represents and warrants that it has all requisite power and authority to grant to Licensee the rights and license contemplated in the Master Services Agreement and these Standard Terms and Conditions.

(b)      By Licensee and each authorized sublicensee:

(i)      No Licensee or authorized sublicensee shall record, edit or alter in any way the telecast of the Events as provided by Promoter.

(ii)      Licensee and each authorized sublicensee shall be responsible for all royalties, reports and payments with respect to performance by exhibition over their facilities of the musical compositions included in the telecast of the Events.

(iii)      No Licensee or authorized sublicensee shall insert any advertising or promotional material in the telecast of the Events.

(iv)      Licensee and each authorized sublicensee represent and warrant that it has all requisite power and authority to enter into and perform the obligations provided in the Master Services Agreement and these Standard Terms & Conditions.

(v)      Licensee and each authorized sublicensee shall comply with restriction set forth in Paragraph 9(b) of these Standard Terms & Conditions.

7.      Advertising, Publicity and Promotion.

(a)      Promoter and parties authorized by Promoter shall advertise, publicize and promote the Events nationally and/or locally to extent and in such manner as Promoter may determine in its discretion, and at Promoter's sole cost and expense.

(b)      Licensee each and sublicensee shall, at their sole cost and expense, promote, publicize and advertise the Events.

(c)      Licensee shall exert its best efforts to market and advertise the Event in order to maximize sublicensing revenue from the outlets.

(d)      The telecast delivered by Promoter shall be exhibited in its entirety without alteration or change of any nature. Other than advertising of the telecast itself, Licensee shall not authorized or permit any advertising, commercial sponsorship or tie-ins of or in connection with the telecast addressed to audiences of the telecasts of the Events.

(e)      Licensee agrees to use such advertising, publicity and promotional material as Promoter may, in its discretion, make available without cost. All promotional material, publicity and advertising used, authorized or distributed by Licensee shall:

17

(i)     Be subject to the reasonable approval of Promoter.

(ii)    Contain no testimonial or endorsement of any product or service.

(iii)   Conform to accepted standards of propriety and not be derogatory to, or ridicule, Promoter, the site, any television distributor, the fighters or anyone else.

(iv)    Terminate upon completion of the Event.

(v)     Not contain any reference to any other attraction similar to the Event, nor to any product, service, company or corporation not approved in writing by Promoter.

(vi)    Contain such publicity credits as Promoter shall advise.

(vii)   Not alter or change the symbol, logo, trademark or service mark of Promoter.

(vii)   Comply with all restrictions or limitations advised by Promoter with respect to materials provided by Promoter.

In promoting, publicizing and advertising the Events, Licensee may use the names, photographs and biographical material of the participants in the Events, and the promoter of the Events, only as furnished by Promoter or upon Promoter's written approval, provided that the same is used only on the telecast or in connection with the sponsorship thereof or advertising, promotion and publicity of the telecast, but Licensee may not use or authorize the use of the foregoing for purposes of endorsement of any commercial product or service.

8.      Merchandise and Programs: Sponsorship.

(a)     Licensee and any sublicensees may not sell or distribute any programs, other publications, or other merchandise relating to the Events or the telecast thereof; provided, however, that if Promoter or its designated representative should make available programs or other merchandise, then the same may be purchased by Licensee at the regularly established wholesale price, and may be given away or resold by Licensee to the persons attending the exhibition at Outlets.

(b)     Licensee and any sublicensees shall not sell, license or permit any sponsorship or advertising rights to the telecast of the Events at Outlets or casino or hotel, or any other entity which conducts a business in the same field as any sponsor approved by Promoter for the Events.

9.      Receipts in Trust.    The portion of any gross receipts due Promoter, until delivered to Promoter, shall be held in trust by Licensee as the property of Promoter until such payment is made. The trust nature of such fund shall not be questioned whether the monies are physically segregated or not.

10.     Taxes.

Licensee hereby covenants and agrees to pay, without limitation, any and all taxes, assessments, levied or charges (however denominated) imposed, levied or assessed by any statute, law, rule or regulation now in effect or hereafter enacted (including, without limitation, ticket taxes, gross receipts, sales, use, GST, property and excise or other similar taxes, license, provincial, territorial, city, athletic commission, boxing telecast or other taxes, howsoever denominated and regardless of to whom the applicable regulation assigns responsibility for payment) on or otherwise in respect of tickets of admission to the Outlets relating to the telecast of the Event or other materials relating thereto, or any right or privilege to use the same, or any receipts, fees, charges, monies, or other sums received or payable in connection with the exhibition and/or exploitation thereof whether or not billed to, or demanded of, Promoter, or with respect to any monies payable to Promoter hereunder; it being the intent hereof that, unless otherwise expressly agreed by

Promoter in writing, the license fee specified as the consideration for the license granted herein shall be net amounts which are free and clear of, and unreduced by, any tax, levy or charge whatsoever kind or nature and howsoever denominated.

11.    Reserved Rights.

All rights of any kind whatsoever in the Events and the telecast other than the rights specifically granted herein (including, without limitation of the foregoing, the rights to license transmissions via direct broadcast satellite services to receive-only satellite antennas (HTVRO) and for transmission to hotel guest rooms, as well as all other electronic and online internet rights) are hereby expressly reserved by Promoter in the MSA (including in Paragraph 2 of the MSA) and any applicable SOW, and may be fully exploited by Promoter and its licensees, except as expressly agreed otherwise in the MSA without regard to whether any such rights shall be competitive with those granted to Licensee.  Promoter shall retain all rights, title and interest in and to its telecast of the Events and all recordings thereof (and all portions and elements thereof) including, without limitation, all copyrights, with the exception of those set forth in the Paragraph 8 of the MSA regarding Anti-Piracy Enforcement for the duration of the MSA Agreement, (and all extensions, renewals and/or reversions thereof), trademarks and all other property rights of any kind whatsoever therein whether now known or hereafter recognized.

12.    Postponement or Cancellation.

Promoter may, in its sole and absolute discretion, cancel or postpone the date or time of the Events at any time, for any reason whatsoever without liability to Licensee with respect to any expenses of any kind incurred by Licensee in connection with the Events, with the exception of the Minimum Guarantee which shall be returned within thirty (30) days of such cancellation.

13.    Other Agreements.

Licensee acknowledges that the rights being granted hereunder are granted to Promoter under separate written agreements with Promoter and Promoter's agreements with other parties. In the event that any such agreement is terminated for reasons beyond Promoter's control, then Promoter shall have the right to terminate this license without any obligation to Licensee or any sublicensee.

14.    Indemnification.

(a)    Licensee and each authorized sublicensee assume liability for, and shall indemnify, defend, protect, save and hold harmless Promoter and its parents, subsidiaries, and affiliated companies, distributors, assigns, licensees and the respective shareholders, directors, officers, employees and agents of the foregoing (the **"Promoter Indemnified Parties"**) from and against any and all claims, actions, suits, costs, liabilities, judgments, obligations, losses, penalties, expenses or damages (including, without limitation, legal fees and expenses) of whatsoever kind and nature imposed on, uncured by or asserted against any of the Promoter Indemnified Parties arising out of, or related to any breach, or alleged breach by the indemnifying party of any representation, warranty or covenant made, or obligation assumed, by the indemnifying party pursuant to this Agreement.  The provisions of this subparagraph shall apply, without limitation, to claims brought by Promoter against Licensee or a sublicensee.

(b)    Promoter assumes liability for, and shall indemnify, defend, protect, save and hold harmless Licensee, its parents, subsidiary and affiliated companies, distributors, assigns, licensees and the respective shareholders, directors, officers, employees and agents of the foregoing (the **"Licensee Indemnified Parties"**) from and against any and all claims, actions, suits, costs, liabilities, judgments, obligations, losses, penalties, expenses or damages (including, without limitation, legal fees and expenses) or whatsoever kind and nature imposed on, incurred

by or asserted against any of the Licensee Indemnified Parties arising out of or related to any breach or alleged breach by Promoter of any representation, warranty or covenant made, or obligation assumed, by Promoter pursuant to his Agreement. The provisions of this subparagraph shall apply, without limitation, to claims brought by Licensee against Promoter.

(c)     In order to seek or receive indemnification hereunder in cases involving third-party claims:

(i)     The party seeking indemnification (the **"Indemnitee"**) must have promptly notified the other (the **"Indemnitor"**) of any claims or litigation of which it is aware to which the indemnification relates; and

(ii)     With regard to any claim or litigation to which the Indemnitor itself is not a party, the Indemnitee must have afforded the Indemnitor the opportunity to participate in any compromise, settlement, litigation or other resolution or disposition of such claim or litigation.

(d)     No patron or viewer shall be deemed to have any privity of contract or direct contractual relationship with Promoter by virtue of this license or a permitted sublicensee. In no event shall Promoter be deemed to have any obligation to, or Licensee or a sublicensee have any right as against Promoter, with respect to any patron or viewer. Licensee and each sublicensee hereby acknowledge that it, and not Promoter, shall be fully responsible for all claims brought by patrons or viewers with respect to the showing of or the failure to show the Events licensed hereunder.

15.     No Assignment.

Neither the Master Services Agreement nor any right hereunder may be assigned by Licensee or any sublicensee. Promoter may assign the Master Services Agreement to any parent, subsidiary or affiliated entity, but same shall not relieve Promoter of any obligations hereunder.

16.     Not an Agency Agreement.

Nothing herein contained shall be deemed to constitute either of the parties a joint venture or partner or agent of the other, and neither Promoter nor Licensee shall hold themselves out as such. Neither party shall become liable by reason of any representation, act or omission of the other contrary to the provisions hereof.

17.     Subject to Applicable Laws.

Nothing herein contained shall require the commission of any act contrary to an express provision of law, or policy of law, or of any rule or regulation of any governmental authority, and if there shall exist any conflict between any provision of these Standard Terms & Conditions and any such law, policy, rule or regulation, the latter shall prevail, and the provision or provisions of this license so affected shall be curtailed, limited of eliminated to the extent necessary to remove such conflict and as so modified these Standard Terms & Conditions shall continue in full force and effect.

18.     Notices.

All notices required to be given pursuant to these terms and conditions shall be sent certified mail, return receipt requested, or delivered by messenger or by email, and shall be deemed given on the third day after mailing or on the day of such messenger or email delivery. Said notices shall be sent to the following addresses:

If sent to Promoter:

Perform Investment Limited
1 World Trade Center, 72nd Floor
New York, NY 10007
Attn: Tom Constabile, VP Business Development
Tom.Constabile@dazn.com

With a copy to: Sunjay Mathews, Head of Legal, North America
Sunjay.Mathews@dazn.com

If sent to Licensee:

Nicolas J. Gagliardi
G & G Closed Circuit Events, LLC
2925 Green Valley Parkway, Suite D
Henderson, NV 89014
nick@ggccevents.com

With a copy to: Thomas P. Riley, Esquire
tprlaw@att.net

19.    Effectiveness.

These Standard Terms & Conditions, the Master Services Agreement, and its Exhibits constitute the full agreement and complete understanding between the parties with respect to the subject matter and supersedes any and all prior understandings, whether written or oral, pertaining to the subject matter hereof and cannot be modified except by a written instrument signed by all parties hereto.

20.    General Provisions.

The invalidity of any provisions of these Standard Terms & Conditions shall not affect the validity of all of its remaining provisions. All prior representations and agreements between the parties relating to the subject matter hereof are merged into this instrument, which may not be modified except by written agreement signed by both parties. The laws of the State of New York applicable to contracts executed and to be fully preformed in the State of New York shall govern these Terms and Conditions and execution of the Master Services Agreement shall constitute the consent of Licensee and any sublicensee to exclusive jurisdiction of New York. Any dispute, controversy or claim arising out of or relating to these Terms and Conditions, including the formation, interpretation, breach or termination thereof, including whether the claims asserted are arbitrable, will be referred to and finally determined by arbitration in accordance with the JAMS Commercial Arbitration Rules before a single arbitrator who shall be selected by the parties to the arbitration and who shall be a retired judge or justice. If the parties are unable to select an arbitrator, the arbitrator will be selected in accordance with the JAMS Rules. The place of arbitration will be New York. Judgment upon the reward rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The prevailing Party in arbitration shall be entitled to its reasonable costs, including the costs of arbitration, and attorneys' fees. Paragraph headings

are for the guidance of the reader only and shall be of no effect in construing the contents of the respective Paragraphs.

    21.    <u>No Representation Regarding Events.</u>

    Licensee understands and acknowledges that the Master Services Agreements involve live sporting Events, and as such, that no representation or warranties are being made concerning what may occur at said Events, and that the Events may end in knockout, technical knockout, disqualification, decision, or otherwise and that there shall be no cause of action, chargeback, or set-off against Promoter by virtue of the conduct of the participants to the Events.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

22

# EXHIBIT

# 2



Rate Card for May 4th DAZN Alvarez vs. Jacobs Event

| Capacity | Pricing | |
| ------------ | ---------- | |
| 1 to 50 | $875 | * Remember to include |
| 51 to 100 | $1,500 | activation fee if you are |
| 101 to 200 | $2,750 | using the per head rate |
| 201 to 300 | $4,000 | calculation for the location |
| 301 to 400 | $5,250 | |
| 401 to 500 | $6.500 | |

 -Rate based on $12.50 per head
 - Activation Fee is $250 and is included in the price
  - Cable Clients: Provider will bill Activation Fee directly.
  -  Texas locations must add 3% State tax
  - Casinos $20 per head, a minimum of 300 persons for $6,000 (Refer to Guy
Laughridge
   - Refer Las Vegas locations to home office